UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSEPH SPRUILL,

                                        Plaintiff,

v.                                                      5:25-cv-00630 (LEK/TWD)

CORTLAND PLASTIC INTERNATIONAL,

                                        Defendant.

_____

APPEARANCES:

JOSEPH SPRUILL
*Plaintiff, pro se*
4295 U.S. Route 11
Apartment C-3
Cortland, NY 13045


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.      INTRODUCTION

The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff

Joseph Spruill ("Plaintiff").  Dkt. No. 1.  Plaintiff has not paid the filing fee for this action and

seeks leave to proceed *in forma pauperis* ("IFP").  Dkt. No. 2.

## II.     IFP APPLICATION

Upon review, the Court finds Plaintiff is financially eligible for IFP status.  *See* Dkt. No.

2.  Therefore, his IFP application is granted.[1]

_____

[1] Although his IFP application has been granted, Plaintiff will still be required to pay fees that he
may incur in this action, including copying and/or witness fees.

III.    **BACKGROUND**

Plaintiff brings this action against defendant Cortland Plastic International ("Defendant")

alleging employment discrimination.  Dkt. No. 1.  Utilizing a form civil complaint pursuant to

Title VII of the Civil Rights Act, as amended, Plaintiff indicates, by checking boxes, he was

subject to wrongful termination and retaliation based on his race or color.  *Id*. at 2-3.[2]  As relief,

Plaintiff requests $70,000.00 for his loss of income and for the retaliation and discrimination.  *Id*.

at 5.

In support of his claims, Plaintiff states, in full:

> On or around Jan 19th 2023 I went to H.R. and made a complaint
> about Don, Christian and her brother because they were always
> complaining about me helping other coworkers.  On or about June
> 8th 2023 John Hartley told me to follow him to an isolated area.
> That's when he told me that he could have me fired for talking with
> a coworker.  I informed him that I was taking him to H.R.  H.R.
> conducted an investigation on Mr. Hartley.  Mr. Basl who helped
> conduct the investigation on Mr. Hartley, lived with him and they
> were best friends.  In retaliation of taking Mr. Hartley to H.R. he
> was ordering my coworkers to skip my breaks as well as my lunch
> breaks.

*Id*. at 3.

The complaint lists three causes of action.  *See id*. at 3-4.  First, Plaintiff states, "I

followed the company's policy as well as the chain of command."  *Id*. at 3.  Second, he indicates,

"I went to H.R. made numerous complaints.  I gave names, incidents, location, and dates."  *Id*. at

4.  Third, Plaintiff claims, "I asked for a full investigation from H.R.  Although with all the

evidence and proof H.R. chose to ignore my complaints and did nothing about it."  *Id*.

---

[2] Citations to Plaintiff's complaint refers to the pagination generated by CM/ECF, the Court's
electronic filing system.  Unless otherwise indicated, excerpts from the record are reproduced
exactly as they appear in the original and errors in spelling, punctuation, and grammar have not
been corrected.

Plaintiff indicates he filed charges with the New York State Division on Human Rights, the New York City Commission on Human Rights, or Equal Employment Opportunity Commission ("EEOC") regarding the alleged discriminatory acts on or about March 27, 2024. *Id*. The EEOC issued a Notice-of Right-to-Sue letter on or about February 20, 2025. *Id*. Plaintiff did not, however, attach a copy of the letter as instructed in the form complaint.

## IV.    LEGAL STANDARD

Section 1915 of Title 28 requires a district court to dismiss an *in forma pauperis* complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint, or portion thereof, when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted). A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) ("[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston*, 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual

contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.").

Additionally, when reviewing a complaint, a court may look to the Federal Rules of Civil Procedure. To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## V.    ANALYSIS

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a Title VII discrimination claim, a plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the position he held; and (3) he suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  "[A]t the initial stage of the litigation . . . the plaintiff does not need substantial evidence of discriminatory intent," and need only "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) ("[A] plaintiff need only give plausible support to a minimal inference of discriminatory motivation.") (citations omitted).  Nevertheless, "a discrimination complaint . . . must [still] at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed."  *EEOC v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (alterations and internal quotation marks omitted).

To establish a retaliation claim under Title VII, a plaintiff must show (1) he participated in a protected activity; (2) the employer knew of his participation in the protected activity; (3) the employer subjected him to an adverse employment action after he participated in the protected activity; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Littlejohn*, 795 F.3d at 316.  In other words, "Title VII forbids an employer

to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).

Here, even under a liberal interpretation, Plaintiff's complaint does not provide a "short and plain statement of the claim showing that the pleader is entitled to relief" and it lacks numbered paragraphs, limited as far as practicable to a single set of circumstances. Fed. R. Civ. P. 8(a), 10. Plaintiff does not identify his race or color or allege specific instances or facts suggesting Defendant took adverse action against him *because* of his race or color. *See* Dkt. No. 1 at 2-3. Plaintiff has not alleged any plausible facts suggesting Defendant possessed any discriminatory intent or acted in a discriminatory manner towards him on the basis of his race or color. *See id.* at 3. Rather, at most, Plaintiff sets forth workplace disputes over job duties, schedules, and work performance. *Id.* "Hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable" in federal court. *Nakis v. Potter*, No. 01-CV-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)). "Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law." *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *2 (S.D.N.Y. Dec. 12, 2008).

Moreover, Plaintiff's claims that he "went to H.R." and "made numerous complaints" and "asked for a full investigation," Dkt. No. 1 at 4, are "conclusory and do[ ] not sufficiently plead that he was engaged in any form of protected activity." *Colas v. City Univ. of N.Y.*, No. 17-cv-4825, 2019 WL 2028701, at *8 (E.D.N.Y. May 7, 2019). Notably, Plaintiff does not include the date of his termination and did not attach a copy of the EEOC's Notice-of Right-to-Sue letter as instructed.

6

In sum, Plaintiff's complaint fails to provide the Court with sufficient information to assess Plaintiff's Title VII claims.  Thus, the complaint is not acceptable under Federal Rules of Civil Procedure 8 and 10 and fails to state a claim upon which relief may be granted under 28 U.S.C. § 1915(e)(2)(B)(ii).  Accordingly, the Court recommends Plaintiff's complaint be dismissed without prejudice and with leave to amend to set forth with detail the facts and circumstances surrounding Plaintiff's Title VII claims.

Plaintiff is advised any amended complaint must comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.  Any amended complaint must set forth his claims in numbered paragraphs, with each paragraph "limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10.  He must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts.  The amended complaint must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.") (internal quotation marks omitted).

## VI.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion for leave to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**, and it is

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: July 31, 2025
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[3] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

🚩 KeyCite Yellow Flag
Distinguished by   Hill v. Rayboy-Brauestein,   S.D.N.Y.,   November 9, 2006

2004 WL 2903718
United States District Court,
S.D. New York.

Helene NAKIS, Plaintiff,
v.
John E. POTTER, Postmaster General,
United States Postal Service, Defendant.

No. 01 Civ. 10047(HBP).
|
Dec. 15, 2004.

*OPINION AND ORDER*

PITMAN, Magistrate J.

I. *Introduction*

 **\*1**  This is an employment discrimination action brought under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* Plaintiff, a former employee of the United States Postal Service, alleges in principal part, that, due to her disability, she was subjected to numerous acts of disparate treatment, denied reasonable accommodations and subjected to a hostile work environment. The parties have consented to my exercising plenary jurisdiction over this action pursuant to 28 U.S.C. § 636(c).

Defendant moves for summary judgment dismissing the complaint on a variety of different grounds. For the reasons set forth below, defendants' motion is granted in part and denied in part.

II. *Facts*

A. *Plaintiff's Employment with the Postal Service Prior to 1997*
Plaintiff commenced her employment with the Postal Service as a probationary clerk in 1967 (Transcript of the Deposition of Helene Nakis ("O'Toole Ex. A") at 22, 74, annexed as Ex. A to the Declaration of Andrew D. O'Toole, dated November 5, 2003 ("O'Toole Decl."); Complaint ("Compl."), ¶ 7; EEO Investigative Affidavit of Plaintiff, dated November 1, 1999

("O'Toole Ex. C"), at PL00322, annexed as Ex. C to the O'Toole Decl.). Plaintiff injured her back on the job in June 1980 (O'Toole Ex. C at PL00322; Decision and Order of the Employees' Compensation Appeals Board ("ECAB"), dated March 15, 2001 ("O'Toole Ex. D"), at US00095, annexed as Ex. D to the O'Toole Decl., at US00095). The Office of Workers Compensation Programs ("OWCP") subsequently awarded plaintiff intermittent temporary disability benefits for this injury (O'Toole Ex. A at 22, 78, 101, 102, 441; O'Toole Ex. D at US00095). OWCP awarded plaintiff temporary total disability benefits on January 12, 1984, and plaintiff completely stopped working at that time (O'Toole Ex. A at 22-23, 78, 102-03, 441; O'Toole Ex. D at US00095). In 1985, plaintiff's employment with the Postal Service was terminated (Compl.¶ 11).

B. *Plaintiff's Re-Employment with the Postal Service in 1997*
In 1996, the OWCP concluded that plaintiff was well enough to return to work and offered plaintiff a modified rehabilitation position (O'Toole Ex. A at 257-58; 304; EEO Investigative Affidavit of Robert A. Cossaro, dated December 14, 1999 ("O'Toole Ex. K"), at 2, annexed as Ex. K to the O'Toole Decl.). Plaintiff initially refused the offer, claiming that she was still unable to work (O'Toole Ex. A at 258). A neutral physician subsequently examined plaintiff and determined that plaintiff was able to return to work (O'Toole Ex. D at U.S. 00095-96).

In September, 1997, the Postal Service offered plaintiff a second modified position, network planning specialist (the "modified position") in the Distribution Networks Office within the New York Metro Area Office, at the James A. Farley Post Office Building in Manhattan (Letter from John P. O'Connor to plaintiff, dated September 25, 1997 ("O'Toole Ex. L"), annexed as Ex. L to the O'Toole Decl.). The requirements of the modified position had been altered to accommodate plaintiff's physical limitations. As modified, the position required only limited kneeling, standing, bending, twisting and reaching, and lifting was limited to a maximum of ten pounds (*see* O'Toole Ex. L). The modified position was a full-time position, with the work day lasting from 8:00 a.m. to 4:30 p.m. Plaintiff accepted this position on October 8, 1997 (O'Toole Ex. L).

 **\*2**  Plaintiff attended an orientation program on October 31, 1997 at which she encountered Robert Cossaro, a human resource specialist employed by the Postal Service (Affidavit of Helene Nakis, sworn to December 8, 2003 ("Nakis Aff.")

¶ 13). According to plaintiff, Cossaro stated to her at that time that she would be " 'much better off retiring on regular retirement since [she] had the age and the service" ' (Nakis Aff. ¶ 13).

Due to an injury suffered at home in late October, plaintiff did not actually re-commence her employment with the Postal Service until December 22, 1997 (*see* Transcript of the OWCP Hearing held on September 2, 1998 ("O'Toole Ex. S"), at US01040-41, annexed as Ex. S to the O'Toole Decl.; Nakis Aff. ¶ 15). Plaintiff's immediate supervisor upon her return to work was Michael J. Farrell, Manager of Distribution Networks (Nakis Aff. ¶ 13). According to plaintiff, Farrell's secretary, Julie Wong, failed to advise plaintiff prior to her return to work of the direct-dial telephone number that would be assigned to plaintiff (Nakis Aff. ¶ 15). As a result, plaintiff did not receive messages concerning her special transportation arrangements (Nakis Aff. ¶ 15). In addition, plaintiff claims that Wong failed to provide her with a key to the employees' restroom and failed to provide plaintiff with telephone directories and business cards in a timely manner (Nakis Aff. ¶ 16). Finally, Wong allegedly stated to plaintiff that Wong did not know why plaintiff was " 'returning to work after all those years [and] getting all that money" ' (Nakis Aff. ¶ 17).

At some point in December 1997, plaintiff asked Ms. Eng, one of her co-workers, to have a handle installed on the door leading to the Distribution Networks Office because "there was no door knob, or anything else for me to hold on in order to open the door" (Nakis Aff. ¶ 22; O'Toole Ex. C at PL00320). Fourteen months later, in early February 1999, a work order requesting that a new door be installed at the entrance of Room 459 was prepared and submitted to the Maintenance Department (Maintenance Work Order Request, dated February 9, 1999, annexed as Ex. AU to the O'Toole Decl.). The handle was not installed until late August 1999 (Nakis Aff. ¶ 22).

Approximately one week after plaintiff re-commenced her employment, she sought to shift her hours from 8:00-4:30 to 7:30-4:00 in order to accommodate certain transportation needs (Letter from Plaintiff to Michael Farrell dated December 30, 1997, annexed as Ex. AP to the O'Toole Decl.). Her request was granted and became effective on January 7, 1998 (Letter from John O'Connor to the OWCP dated January 14, 1998, annexed as Ex. AQ to the O'Toole Decl.).

In addition, shortly after plaintiff recommenced her employment, she concluded that she was not able to work a full eight-hour day due to her physical limitations (Nakis Dep. at 385-386, 401-403), and on January 7, 1998, plaintiff's physician, Dr. Tambakis, told her she could only work six hours per day (O'Toole Ex. D at US00096). Plaintiff's request for a modified schedule was granted, and from January 12, 1998 through the end of her employment with the Postal Service, plaintiff worked only six hours per day (*see* Transcript of the OWCP Hearing, dated August 20, 1999 ("O'Toole Ex. W"), at US004081, annexed as Ex. W to the O'Toole Decl.; Nakis Aff. at ¶ 24). The two hours per day that plaintiff did not work were charged to leave without pay (Letter from plaintiff to OWCP, dated October 14, 1999 at PL0002128, annexed as Ex. AR to the O'Toole Decl.). Plaintiff has submitted evidence that Farrell denied her additional request to leave a few minutes earlier each day to use special transportation services for individuals with disabilities (Nakis Aff. ¶ 28).

**\*3** Shortly after she re-commenced employment, plaintiff also raised a question concerning the appropriateness of the desk to which she had been assigned (O'Toole Ex. K at 2). Specifically, plaintiff complained that she had to remove items that had been left on her desk and had to clean the desk, both of which caused her back pain (O'Toole Ex. A at 404). Thereafter, the Postal Service consulted with Marcia Brier, the OWCP Rehabilitation Counselor, who made suggestions concerning reorganizing plaintiff's desk which were implemented (O'Toole Ex. A at 652; O'Toole Ex. K at 2). Plaintiff then requested a lower desk, and by February 24, 1998, she was transferred to a desk that plaintiff felt was appropriate "for [her] physical limitations" (O'Toole Ex. A at 673; O'Toole Ex. C at PL00319). Again, however, plaintiff had to clean the second desk to which she had been assigned (O'Toole Ex. A at 674). In addition, on January 12, 1998, plaintiff was provided with an ergonomically designed back and seat support for her chair and hide-a-board drawer for her computer (O'Toole Ex. K at 2-3). Personnel from the Postal Service's Safety Office examined plaintiff's workstation on multiple occasions, and concluded that it was appropriate for plaintiff from an ergonomic point of view (O'Toole Ex. A at 652; O'Toole Ex. K at 2).

Plaintiff's chair was also replaced twice in response to her complaints. In February 1998, Robert Cossaro gave plaintiff his own ergonomic chair (O'Toole Ex. K at 3; Nakis Aff. ¶ 21). When plaintiff complained that the chair did not relieve her symptoms and requested an orthopedic

chair, Cossaro requested medical documentation to support plaintiff's request because no such documentation was in her file (O'Toole Ex. A at 652-58; O'Toole Ex. K at 3; Nakis Aff. ¶ 21). Plaintiff submitted a note from her physician on March 26, 1998 corroborating her need for an orthopedic chair, and she was provided with such a chair sometime in the first weeks of April 1998 (O'Toole Ex. A at 655-58; O'Toole Ex. C at PL00319; Letter from plaintiff to Robert Cossaro, dated March 26, 1998, annexed as Ex. AZ to the O'Toole Decl.). Plaintiff made no further complaints or requests concerning any chair after April of 1998, although her back continued to hurt whenever she sat for an extended period of time (O'Toole Ex. A at 658).

In addition, commencing in early 1998 plaintiff attended a number of computer training courses. Specifically, plaintiff attended five eight-hour computer courses, including: (1) Windows 95 Introduction on January 13, 1998; (2) Word 7.0 for Windows 95 Introduction on January 16, 1998; (3) cc:Mail 6.0 for Windows 3.1 on January 29, 1998; (4) Excel 7.0 for Windows 95 on February 4, 1998, and (5) Word 7.0 for Windows 95 Intermediate on January 14, 1999 (O'Toole Ex. A at 771-73; *see also* Exhibit AX to O'Toole Decl.). Olivia Philpot-Forehand, also provided plaintiff with one-on-one training on how to use e-mail, (O'Toole Ex. A at 496; O'Toole Ex. K at 2), and Gerald Ross, a co-worker, was assigned to teach plaintiff how to prepare certain computer-generated reports used in the office (O'Toole Ex. A at 863-65; Letter from plaintiff to Mark Stein, dated September 25, 1999, annexed as Ex. BA to the O'Toole Decl.).

 **\*4** In both March, 1998, and September, 1999, plaintiff sought permission to attend a four-day, 32-hour computer training program in Indianapolis (O'Toole Ex. A at 631-636; Logistics Networks Course Description, annexed as Ex. BD to the O'Toole Decl.). At the time, plaintiff made her request to attend the Indianapolis training, her physical restrictions prevented her from lifting more than ten pounds, sitting for extended periods of time, and working more than eight hours per day (O'Toole Ex. A at 634-35; Letter to Helene Nakis, dated September 25, 1997, annexed as Ex. L to the O'Toole Decl.). Defendant has offered testimony from Mark Stein, who became plaintiff's day-to-day supervisor in February or March 1998 (O'Toole Ex. A at 351-53), that he denied plaintiff permission to attend this program because he was concerned about the impact of the trip and the eight-hour daily lectures on plaintiff's back problems (Deposition of Mark Stein ("O'Toole Ex. BE") at 57-63, annexed as Ex. BE to the O'Toole Decl.). Plaintiff testified that although she had

considered requesting permission to use a "sky cap" at the airport to carry her luggage, she never made that request nor any other request for an accommodation concerning the Indianapolis training (O'Toole Ex. A at 640; O'Toole Ex. BE at 62). Instead of permitting plaintiff to attend the program, Mr. Stein provided plaintiff with substitute training by her co-workers (O'Toole Ex. A at 642; O'Toole Ex. BE at 60-64; EEO Investigative Affidavit of Mark Stein, dated November 30, 1999, annexed as Ex. BF to the O'Toole Decl.). Four other network planning specialists who worked in the same facility as plaintiff did not attend the Indianapolis training (Statement of Mark Stein, dated November 30, 1999, annexed as Ex. BF to the O'Toole Decl.). The training materials from the Indianapolis course were subsequently provided to plaintiff, and three co-workers were assigned to provide additional training to plaintiff (O'Toole Ex. A at 1023; O'Toole Ex. BE at 63-64).

On April 23, 1998, plaintiff attended a work meeting lasting several hours (O'Toole Ex. S at 33). Because she felt self-conscious about doing so, plaintiff did not get up to stand periodically, and suffered an injury to her back (O'Toole Ex. A at 428-31; O'Toole Ex. S at 33). As a result of this injury, plaintiff was unable to attend work from April 27, 1998 through May 7, 1998 (O'Toole Ex. A at 458; Declaration of Mark J. Stein, dated November 5, 2003 ("Stein Decl.") at ¶ 10 and Ex. A thereto).

Four days after returning to work in May, plaintiff sustained an additional injury. While walking down a ramp outside the Distribution Networks Office, plaintiff lost her balance and slipped but did not fall (O'Toole Ex. A at 458-59; O'Toole Ex. W at US004080 ("I slipped, but I didn't quite fall.")). Plaintiff attributed injuries to her left foot and ankle to this accident and, as a result, was out of work until August 3, 1998 (O'Toole Ex. A at 468; O'Toole Ex. W at 004118-19; Ex. A to Stein Decl.). When plaintiff returned to work, Cossaro recommended that plaintiff use the 33rd Street entrance to the building because that would permit her to use an elevator, ramp and handrails and to avoid the ramp on which she had previously slipped (Letter from Robert Cossaro to plaintiff, dated June 3, 1998, annexed as Ex. AW to the O'Toole Decl.).

 **\*5** On June 2, 1998, while plaintiff was out of work, she filed her first charge with the Postal Service's EEO office, alleging discrimination based on disability, sex and retaliation (EEO Complaint of Discrimination in the Postal Service, dated June 1, 1998 ("O'Toole Ex. BL"), annexed as Ex. BL to the O'Toole Decl.). [1] Plaintiff raised eight issues during the course of

the investigation: (1) the salary she was receiving had been miscalculated in view of her former service, which adversely affected her compensation and retirement rights; (2) errors were made in the calculation of the amount of sick leave, annual leave and leave without pay she had used during the 1980's; (3) the delay in providing her with an appropriate desk and chair, and the delay in providing a door handle constituted a failure to provide reasonable accommodations; (4) she was unfairly being required to take the two hours per day that she could not work as leave without pay; (5) she had not received proper computer training; (6) plaintiff's time out of work in the 1980's should have been charged as compensation time due to an on-the-job injury; (7) she was harassed to come back to work in October of 1997 in order to get her back to work so defendant then could force her to retire, (8) her career with the Postal Service defendant was destroyed, and (9) her health was destroyed (O'Toole Ex. C at PL00315-23). Plaintiff had first contacted the Postal Service's EEO counselor concerning these matters on March 10, 1998 (Nakis Aff. ¶ 34).

[1]    Although plaintiff checked off the box for "sex" on her 1998 EEO Complaint, plaintiff concedes that she never mentioned sex as a basis for discrimination during the EEO informal counseling process (O'Toole Ex. A at 694-95).

In mid-November 1998, plaintiff submitted another note from her physician, Dr. Tambakis, indicating that plaintiff needed to stand up and walk around at least two times per day in order to relieve her back pain (Note from Dr. Apostolos P. Tambakis, dated November 18, 1998 at US04251, annexed as Ex. AS to the O'Toole Decl.). Nothing in Dr. Tambakis's note indicated that plaintiff needed to walk outdoors. Plaintiff was advised on November 30, 1998, that she could take breaks in the morning and afternoon to walk, and that she could leave her chair to take short walks on an "as needed basis" (Letter from Michael Farrell to plaintiff, dated November 30, 1998 at US04234, annexed as Ex. AT to the O'Toole Decl.).

In December 1998, defendant had a verbal altercation with Wong concerning the emptying of a garbage can. While plaintiff was heating up a cup of tea on December 15, 1998, plaintiff asked Wong to have someone empty or remove a garbage can (O'Toole Ex. A at 485-86; E-Mail from plaintiff to Mark Stein, dated December 16, 1998 ("O'Toole Ex. BS"), annexed as Ex. BS to the O'Toole Decl.). Wong responded by telling plaintiff that she was not a garbage collector and that no one in the office respected plaintiff (O'Toole Ex. BS). Following the incident, plaintiff prepared an e-mail to Stein detailing the incident (O'Toole Ex. BS). While plaintiff was

preparing the e-mail, Stein went to plaintiff's cubicle and told plaintiff that she had no right to yell at secretaries and accused plaintiff (falsely, according to plaintiff) of abandoning her duties at the control center (O'Toole Ex. A at 490-91). Although plaintiff attempted to explain herself, Stein said he did not want to hear anything and walked away (O'Toole Ex. A at 493). At that point, plaintiff could feel her back beginning to spasm, and thereafter plaintiff sought medical treatment (O'Toole Ex. A at 493). Plaintiff was out of work for a month after this incident, returning on January 11, 1999 (Stein Decl. ¶¶ 10-11 and Exs. A and B thereto).

**\*6**  Plaintiff claims that on January 12, 1999 Cossaro said to her " 'your bones are getting old ... look I gave you good advice, but you don't listen ... you have the age. Why don't you get out?" (Nakis Aff. ¶ 51).

A little more than a week after her return to work, on January 26, 1999, plaintiff contacted an EEO counselor with the Postal Service to initiate informal counseling; plaintiff claimed that she was being subjected to discrimination based upon her gender and disability and in retaliation for her prior EEO activity (Information for Precomplaint Counseling, dated February 2, 1999 ("O'Toole Ex. BN"), annexed as Ex. BN to the O'Toole Decl.). Specifically, plaintiff alleged that: (1) Stein unfairly reprimanded her based on her request to Wong to have the garbage can emptied; (2) defendant had "totally messed up" her OWCP records, (3) unnamed individuals had tampered with her computer, (4) she was required to fill out paperwork for minor latenesses that was not required of other employees, (5) she was required to submit a 3971 form for the two hours she was unable to work each day, (6) records concerning plaintiff's compensation claim based upon her May 11, 1998 injury had been falsified to cover up for defendant's negligence, and (7) other employees were not charged with Annual Leave, Sick Leave or Leave Without Pay when they absent from work for less than four hours (O'Toole Ex. BN).

Plaintiff met with an EEO counselor on February 16, 1999 (Letter from plaintiff to Christine Patterson, dated February 26, 1999 ("O'Toole Ex. BO"), annexed as Ex. BO to the O'Toole Decl). Ten days after the meeting, plaintiff wrote to the counselor withdrawing her 1999 EEO Complaint. Plaintiff stated that she was withdrawing the complaint because "it looks to me that things are going the way the First EEO Complaint went, and I must, in order to protect my health and my rights, pursue other avenues" (O'Toole Ex. BO at PL00917).

2004 WL 2903718, 16 A.D. Cases 518

In March 1999, plaintiff had a disagreement with a co-worker-Keller-concerning the extent to which a window in an office they shared should be open (Plaintiff's Memo to Mark Stein dated March 4, 1999 ("O'Toole Ex. BT"), annexed as Ex. BT to the O'Toole Decl.). Plaintiff spoke to Stein about the incident, and Stein, in turn, spoke with Keller (Plaintiff's 3-4-99 Memo (O'Toole Ex. BT)). On the following day, March 4, 1999, Keller approached plaintiff at her desk and asked: "Helene, don't you have any work to do? Just go stick your nose to the screen." Plaintiff responded: "What right do you have to talk to me like that?" He replied: "Because I'm a supervisor." At that point, plaintiff responded: "Not mine, you are not." Plaintiff alleges that Keller came closer to her cubicle and stated: "Oh yeah, you see what's going to happen, just wait and see" (O'Toole Ex. BT).

On March 19, 1999, plaintiff filed another FECA claim for a traumatic injury alleging that on March 9, 1999 she experienced traumatic stress due to the alleged harassment by Stein (Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation, dated March 19, 1999, annexed as Ex. AM to the O'Toole Decl.). As a result of the claimed stress, plaintiff did not attend work from March 10, 1999 through August 16, 1999 (O'Toole Ex. A at 746-47; Exhibit B to Stein Decl.).

 *7  When plaintiff returned work in August 1999, her work location was moved to a cubicle in the middle of the office (O'Toole Ex. A at 854-55; Nakis Aff. ¶ 50). Although plaintiff made no complaint about the desk itself, plaintiff complained that her new location was isolating and did not afford her as much opportunity to interact with co-workers (O'Toole Ex. A at 854-55).

On September 24, 1999, plaintiff had an argument with Stein concerning the adequacy of the lighting at plaintiff's desk (Letter from plaintiff to Mark Stein, dated September 25, 1999, annexed as Ex. BW to the O'Toole Decl.).

Later on that week, plaintiff had another argument with Farrell's secretary concerning plaintiff's time records. When Stein approached Farrell's secretary concerning the matter, plaintiff also approached the secretary's desk. The secretary told plaintiff "I do not take orders from you. I take orders from Mark Stein. He is my supervisor." Stein then said to plaintiff in a loud voice, "I am giving you a direct order. Go back to your desk, now!" Plaintiff replied, "Yes sir, Mr. Stein. I will obey your direct order and go to my desk." Plaintiff

took great offense at receiving a direct order in "full view" of the secretarial staff (Letter from plaintiff to Mark Stein, dated September 27, 1999, annexed as Ex. BX to the O'Toole Decl.).

On September 29, 1999, plaintiff had another heated conversation with Farrell's secretary concerning the manner in which the secretary had signed for a certified letter. The secretary told plaintiff "to go to hell" during some petty exchanges concerning the matter. Plaintiff then complained to Farrell who told plaintiff that she "should not send so many [c]ertified letters, and that some of these subjects could be handled by talking, [instead]." Farrell also told plaintiff that she "cannot tell people what to do ." After speaking to Mr. Farrell, plaintiff sought medical attention for elevated blood pressure, and left work on September 29, 1999 never to return (Letter from plaintiff to Mark Stein, dated October 2, 1999, annexed as Ex. BY to the O'Toole Decl.).

On November 3, 1999, plaintiff contacted an EEO Counselor for informal counseling concerning the allegations that formed the basis of plaintiff's January 2000 complaint of discrimination (O'Toole Ex. A at 856; Informal Complaint of Discrimination, dated January 10, 2000, Complaint of Discrimination in the Postal Service, dated January 21, 2000, annexed as Exs. BP and BQ, respectively, to the O'Toole Decl.). Plaintiff alleged in her January 2000 complaint that defendant had discriminated against her based on sex, age, disability and retaliated against her for her prior EEO activity by the following acts: (1) on August 16, 1999, plaintiff's desk was moved to an isolated location, (2) upon her return to the office in August of 1999, plaintiff discovered that her computer had been tampered with, (3) on September 23, 1999, Stein denied plaintiff permission to attend an Excel computer class that she had previously taken, (4) on September 24, 1999, Stein refused to fix the light fixture above her desk area, (5) on September 27, 1999, Stein ordered plaintiff to return to her desk following her confrontation with a secretary in the Distribution and Networks Office, (6) on September 29, 1999, Injury Compensation allegedly falsified plaintiff's records with OWCP with respect to one of her FECA claims, (7) Stein issued her a letter demand for the amount of annual leave she had requested to buy back pursuant to the Postal Service's Buy Back policy, and (8) on unspecified dates, plaintiff was denied information about her annuity benefits (Complaint of Discrimination in the Postal Service, dated January 21, 2000, annexed as Ex. BQ to the O'Toole Decl.). The Postal Service issued its final agency decision concerning plaintiff's 2000 EEO Complaint on August 1, 2003; it concluded that all of plaintiff's claims of discrimination and retaliation failed on

the merits (Notice of Final Decision, dated August 1, 2003, annexed as Ex. BR to the O'Toole Decl.).

### C. *Procedural History*

**\*8** On November 13, 2001, plaintiff commenced this action based on the allegations contained in her 1998 EEO Complaint, asserting causes of action for: (1) discrimination because of disability under the Rehabilitation Act (Count One); (2) discrimination because of disability under the Americans with Disabilities Act (Count Two); and (3) retaliation for prior EEO activity in violation of Title VII (Count Three). Counts Two and Three, as well as plaintiff's claim for punitive damages have been dismissed. *See* Order, dated January 18, 2002; Stipulation and Order, dated January 28, 2002. All that remains is plaintiff's claim under the Rehabilitation Act. All discovery in this matter is now complete.

### III. *Analysis*

#### A. *Summary Judgment Standard*

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). This form of relief is appropriate when, after discovery, the party-here plaintiff-against whom summary judgment is sought, has not shown that evidence of an essential element of her case-one on which she has the burden of proof-exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact. An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990). Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come

forward with "specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines. Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993). If the nonmovant fails to meet this burden, summary judgment will be granted against it. *Gallo v. Prudential Residential Servs.,* 22 F .3d 1219, 1224 (2d Cir.1994).

*Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.... In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant.... Stated more succinctly, '[t]he evidence of the non-movant is to be believed." ' *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 253-54 (2d Cir.2002) (citations omitted). *See also Make the Road by Walking, Inc. v. Turner,* 378 F.3d 133, 142 (2d Cir.2004); *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003); *Hayut v. State Univ. of New York,* 352 F.3d 733, 743 (2d Cir.2003); *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999); *Hemphill v. Schott,* 141 F.3d 412, 415 (2d Cir.1998); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997).

**\*9** Summary judgment is "ordinarily inappropriate" in employment discrimination cases, such as this one, where the employer's intent and state of mind are in dispute. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Moreover, in discrimination cases

> summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error.

*Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998) (citations omitted). *See Weber v. Parfums Givenchy, Inc.,* 49 F.Supp.2d 343, 354 (S.D.N.Y.1999).

Although the central role of intent requires that caution be exercised in addressing a summary judgment motion made in a discrimination case, " 'the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to ... other areas of litigation." ' *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001), *quoting Meiri v. Dacon, supra,* 759 F.2d at 998. Thus, the Court of Appeals for the Second Circuit has expressly "remind[ed the] district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." ' *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000), *quoting McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994). *See generally James v. New York Racing Ass'n,* 233 F.3d 149 (2d Cir.2000) (affirming grant of summary judgment in age discrimination case); *Schnabel v. Abramson,* 232 F.3d 83 (2d Cir.2000) (same); *Elliott v. British Tourist Auth.,* 96 Civ. 9154(NRB), 2001 WL 435633 (S.D.N.Y. Apr. 30, 2001) (granting summary judgment in age discrimination case); *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236 (S.D.N.Y.2001) (granting summary judgment in race discrimination case).

B. *Timeliness of Plaintiff's Claims and Plaintiff's Exhaustion of Administrative Remedies*

1. *Claims Based on Events Occurring Before January 24, 1998*

Defendant first contends that any claims based on conduct occurring before January 24, 1998 must be dismissed because plaintiff did not timely raise and exhaust such claims in administrative proceedings.

Title 29 of the Code of Federal Regulations, Section 1614.105(a)(1), requires a plaintiff bringing claims against the federal government under the Rehabilitation Act to exhaust administrative remedies within a certain time frame prior to bringing a claim in federal court. Failure to exhaust in a timely manner results in the claims being time-barred, subject to certain equitable tolls. As the Honorable Guido Calabresi, United States Circuit Judge, explained in *Boos v. Runyon,* 201 F.3d 178, 181 (2d Cir.2000):

**\*10** EEOC regulations require an employee suing the federal government under the Rehabilitation Act to exhaust

certain administrative remedies before initiating a suit in the district court. Thus, an aggrieved agency employee must first seek EEO counseling within forty-five days of the allegedly discriminatory act. *See* 29 C.F.R. § 1614.105(a)(1). The employee must then file an EEO complaint with "the agency that allegedly discriminated against the complainant." *Id.* § 1614.106. Within ninety days of that agency's final decision, or after the passage of 180 days from the filing of the complaint with the agency if no final decision has yet been rendered, the complainant may file suit in federal court. *See id.* § 1614.408.

*See Fridia v. Henderson,* 99 Civ. 10749(BSJ), 2000 WL 1772779 at \*9 (S.D.N.Y. Nov. 30, 2000) ("Failure to bring a claim within the 45 day time period usually precludes the claimant from pursuing a discrimination claim in federal court." (citations omitted)); *Lynk v. Henderson,* 98 Civ.2086(MGC), 2000 WL 178859 at \*5 (S.D.N.Y. Feb. 15, 2000) ("In order to exhaust administrative remedies a federal employee must comply with EEOC regulations. The applicable regulation requires an employee of a federal agency to 'initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory.' 29 C.F.R. § 1614.105(a)(1)." (citations omitted)); *Dillard v. Runyon,* 928 F.Supp. 1316, 1323 (S.D.N.Y.1996) ("Exhaustion of administrative remedies requires that a federal employee ... must consult a counselor at her agency's EEO office within 45 days of the alleged discriminatory act ."). *See also Baber v. Runyon,* 97 Civ. 4798(DLC), 1998 WL 912065 at \*2-\*3 (S.D.N.Y. Dec. 30, 1998).

Plaintiff first sought EEO counseling on March 10, 1998 (O'Toole Ex. A at 608) and first filed a formal complaint on June 1, 1998 (O'Toole Ex. BL). Accordingly, defendant claims that all conduct occurring before January 24, 1998, *i.e.* more than 45 days before March 10, 1998, is time-barred. Plaintiff responds by arguing that conduct occurring before that date is, nevertheless, actionable under the "continuing violation" theory.

Prior to 2002, the continuing violation-doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. *See Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001). *See also De La Fuente v. DCI Telecomms., Inc.,* 259 F.Supp.2d 250, 266 (S.D.N.Y.2003); *Branch v. Guilderland Cent. Sch. Dist.,* 239 F.Supp.2d 242, 253 (N.D.N.Y.2003); *Stalter v. Bd. of Co-op. Educ. Servs. of Rockland County,* 235 F.Supp.2d 323, 332

2004 WL 2903718, 16 A.D. Cases 518

(S.D.N.Y.2002); *Figueroa v. City of New York,* 198 F.Supp.2d 555, 564 (S.D.N.Y.2002).

The scope of the continuing violation doctrine was substantially restricted by the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002). In that case the Supreme Court unanimously held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 114. The Court went on to identify "termination, failure to promote, denial of transfer, or refusal to hire" as examples of conduct that constituted a "discrete discriminatory act." 536 U.S. at 114. The Court did, however, note that a hostile work environment would support the application of the continuing violation doctrine because such a claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " 536 U.S. at 117. Thus, where a plaintiff alleged a hostile-environment claim, conduct outside the applicable limitations period could be asserted so long as one act giving rise to the hostile-environment claim was within the limitations period. 536 U.S. at 117. *See also Patterson v. County of Oneida,* 375 F.3d 206, 220 (2d Cir.2004); *Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130, 133-35 (2d Cir.2003); *Milani v. Int'l Bus. Machs. Corp.,* 322 F.Supp.2d 434, 452 (S.D.N.Y.2004); *Bailey v. Synthes,* 295 F. Supp .2d 344, 353-54 (S.D.N.Y.2003). [2]

[2]   Even before the Court's decision in *Morgan,* the doctrine was disfavored in this Circuit, *Bernstein v. The MONY Group, Inc.,* 228 F.Supp.2d 415, 418 (S.D.N.Y.2002), *quoting Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 244 (S.D.N.Y.2000); *see also Branch v. Guilderland Cent. Sch. Dist.,supra,* 239 F.Supp.2d at 253; *Marinelli v. Chao,* 222 F.Supp.2d 402, 413 (S.D.N.Y.2002), and was "applied only upon a showing of compelling circumstances." *Salgado v. City of New York,* 00 Civ. 3667(RWS), 2001 WL 290051 at *5 (S.D.N.Y. Mar. 26, 2001), *citing Katz v. Beth Israel Med. Ctr.,* 95 Civ. 7183(AGS), 2001 WL 11064 at *8 (S.D.N.Y. Jan. 4, 2001) *and Findlay v. Reynolds Metals Co.,* 82 F.Supp.2d 27, 37 (N.D.N.Y.2000). *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907-08 (2d Cir.1997).

**\*11** Accordingly, except to the extent, if at all, that pre-January 24, 1998 conduct evidences a hostile-environment claim, defendant's motion is granted, and plaintiff is precluded from asserting any pre-January 24, 1998 conduct by

defendant as specific, compensable acts of discrimination. Nevertheless, as plaintiff correctly notes, time-barred conduct may still be offered as evidence of intent to support timely claims. *National R.R. Passenger Corp. v. Morgan, supra,* 536 U.S. at 102 ("[T]he statute [does not] bar an employee from using the prior acts as background evidence to support a timely claim."); *see generally* Fed.R.Evid. 404(b).

### 2. *Claims for Which Plaintiff Sought Counseling in 1999 and Which Were Asserted in February 2, 1999 "Information for Pre-complaint Counseling"*

Defendant next seeks summary judgment dismissing the claims plaintiff asserted in her February 2, 1999 administrative complaint (O'Toole Ex. BN) but subsequently withdrew (O'Toole Decl. Ex. BO). Defendant argues that by withdrawing these claims, plaintiff failed to exhaust her administrative remedies. *See Khader v. Aspin,* 1 F.3d 968, 970-71 (10th Cir.1993) (withdrawal of EEOC claim before conclusion of proceedings constitutes failure to exhaust administrative remedies); *Baber v. Runyon, supra,* 1998 WL 912065 at *5. Plaintiff counters with the contention that the conduct she asserted in 1999 was "reasonably related" to her 1998 EEO filing and, therefore, the 1998 filing exhausted administrative remedies with respect to the claims plaintiff asserted in 1999. *See generally Deravin v. Kerik,* 335 F.3d 195, 200-01 (2d Cir.2003).

It is well-settled in this Circuit that an administrative complaint of discrimination should be construed to include not only the claims expressly asserted in the complaint but also timely claims that are "reasonably related" to the claims expressly asserted in the complaint. *Deravin v. Kerik, supra,* 335 F.3d at 200-01; *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001) (*per curiam* ); *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1402 (2d Cir.1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998).

The Second Circuit has recognized three different situations where claims not alleged in an EEOC charge are sufficiently related to provide jurisdiction: (1) where the claim brought in the civil action concerns conduct which would fall within the reasonable scope of the EEOC investigation; (2) where the claim alleges retaliation for

Nakis v. Potter, Not Reported in F.Supp.2d (2004)
Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 17 of 40
2004 WL 2903718, 16 A.D. Cases 518

filing the EEOC charge; and (3) where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

*Nweke v. Prudential Ins. Co. of Am.,* 25 F.Supp.2d 203, 214 (S . D.N.Y.1998), *citing Butts v. City of New York Dep't of Hous. Preservation & Dev., supra,* 990 F.2d at 1402-03. *See also Alfano v. Costello,* 294 F.3d 365, 381 (2d Cir.2002); *Santos v. City of New York,* 01 Civ. 0120(SAS), 2001 WL 1568813 at *2 (S.D.N.Y. Dec. 7, 2001).

**\*12** Defendant argues, without citation to any authority, that plaintiff's withdrawal of her 1999 complaint necessarily renders inapplicable the doctrine that an administrative discrimination complaint includes subsequent reasonably-related claims (Defendant's Reply Memorandum of Law, dated December 23, 2003 ("Def. Reply Mem.") at 3). Although the matter is not free from doubt, I conclude that defendant's argument is unconvincing.

First, defendant's argument is inconsistent with the conduct of a number of courts which have evaluated claims asserted in withdrawn administrative complaints to determine if they were properly before the court as being reasonably related to non-withdrawn complaints. *E.g., Johnson v. Jewel Food Stores, Inc.,* 98 C 4440, 2000 WL 876093 at *2 (N.D. Ill. June 29, 2000); *Brown v. City of New York,* 869 F.Supp. 158, 171 (S.D.N.Y.1994); *Miller v. Frank,* 89 C 9193, 1991 WL 34711 at *1-*2 (N.D.Ill. Mar. 13, 1991). If the withdrawal of an administrative claim *ipso facto* resulted in a permanent bar of the claim, there would be no need for the analysis in these cases.

Second, administrative claims are frequently made by unsophisticated individuals without the benefit of counsel and, therefore, courts have construed administrative claims broadly in order to effectuate the intent of the underlying remedial statutes. *See generally Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967); *Butts v. City of New York Dep't of Hous. Preservation & Dev., supra,* 990 F.2d at 1402-03. This rationale applies with equal force to assessing the consequences of the withdrawal of an administrative complaint.

I conclude that the withdrawal of plaintiff's 1999 administrative complaint does not, by itself, bar the assertion of the claims asserted therein if they are reasonably related to the claims asserted in plaintiff's 1998 administrative complaint. [3] Resolution of whether the claims asserted in plaintiff's 1999 administrative complaint are reasonably related to the claims asserted in plaintiff's 1998 complaint requires examination of the claims asserted in both complaints.

[3]     My research has disclosed one case in which a court has reached the opposite result, namely *Sharon v. Yellow Freight Sys., Inc.,* 872 F.Supp. 839, 846 (D.Kan.1994). The court in *Sharon,* however, cited no authority for its conclusion and offered no explanation. In addition, no reported case has followed *Sharon* on this issue. Accordingly, I respectfully decline to follow *Sharon.*

In her 1998 administrative complaint, plaintiff alleged that she was discriminated against on the basis of sex and disability and that she was the victim of retaliation (O'Toole Ex. BL at PL00481). The disability alleged was "lower back and right leg" (O'Toole Ex. BL at PL00481). In the course of the ensuing investigation, plaintiff specified eight adverse consequences of the discrimination: (1) plaintiff was re-employed in 1997 at a lower rate of compensation than she should have received; (2) during the 1980's plaintiff was forced to use excessive amounts of sick leave, annual leave and leave without pay which also adversely affected her compensation; (3) plaintiff was denied a desk and chair that were appropriate for her disabilities and defendants also failed to install a door handle which she needed as a result of her disability; (4) plaintiff was unfairly forced to take leave without pay for hours she was unable to work pending adjudication of her various FECA claims; (5) plaintiff was denied computer training and excluded from a training program conducted in Indianapolis; (6) as a result of the manner in which defendant processed plaintiff's leave requests in the 1980's, plaintiff was deprived of sick leave and annual leave and denied increases in her FECA compensation; (7) plaintiff was harassed into returning to work and coming off compensation so that she could be forced to retire, and (8) plaintiff's career and health were destroyed (O'Toole Ex. C at PL00315-23).

**\*13** In her 1999 complaint, plaintiff alleged that she was discriminated against on the basis of her gender, on the basis of an unspecified physical disability and

subjected to retaliation for unspecified activity (O'Toole Ex. BN). In support of these claims, plaintiff alleged that: (1) Stein unfairly reprimanded her for requesting that Wong have someone empty a garbage can; (2) her injury compensation was "totally messed up"; (3) unidentified individuals tampered with her computer and no preventative action had been taken; (4) she was disciplined more harshly than other employees for being twenty minutes late for work; (5) she was required to submit certain paperwork for the two hours she was unable to work each day; (6) her records concerning her May 11, 1998 injury had been falsified to cover up for defendant's negligence, and (7) she was forced to take Annual Leave, Sick Leave or Leave Without Pay for short periods of time that she was unable to work while other employees were treated more leniently (O'Toole Ex. BN).

To the extent the incidents in plaintiff's 1999 EEOC complaint postdate her 1998 complaint, I conclude that they are reasonably related to the charges in plaintiff's 1998 complaint because they can be construed to constitute either acts of retaliation for the filing of the 1998 complaint or "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Nweke v. Prudential Ins. Co. of America, supra,* 25 F.Supp.2d at 214. Both complaints allege retaliatory conduct and discrimination on the same bases, namely gender, disability and retaliation. *See Bailey v. Colgate-Palmolive Co .,* 99 Civ. 3228(CBM), 2003 WL 21108325 at *13 (S.D.N.Y. May 14, 2003), *aff'd without published opinion,* 93 Fed. Appx. 321 (2d Cir.2004) (to qualify as "reasonably related" subsequent discriminatory acts must be based on the same type of discrimination); *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F.Supp.2d 455, 458 (S.D.N.Y.1998) (same).

However, to the extent that the conduct alleged in the 1999 complaint predates the 1998 complaint, it cannot be deemed to be reasonably related. As a matter of logic, conduct that predated the 1998 complaint could not constitute retaliation for the 1998 complaint. In addition, events occurring before the 1998 complaint cannot fairly be considered "further" incidents of discrimination. In light of the decision in *National Railroad Passenger Corp. v. Morgan, supra,* 536 U.S. 101, "further" acts of discrimination must be limited to acts subsequent to the EEOC complaint; any other construction would revive the "continuing violation" doctrine with respect to non-environmental claims, in direct contravention of the holding in *Morgan.*

Accordingly, summary judgment is granted dismissing plaintiff's claims in her 1999 EEOC complaint that her injury compensation was "totally messed up," because that claim is based on conduct occurring prior to March 1998. In all other respects, defendant's motion to dismiss the claims asserted in plaintiff's 1999 administrative complaint is denied.

### 3. *Claims Asserted in Plaintiff's 2000 EEOC Complaint*

**\*14** Defendant next argues that the claims asserted in plaintiff's 2000 EEOC complaint cannot be pursued here because plaintiff has indicated through her counsel that she intends to pursue these claims in a separate action. Plaintiff makes no response to this argument.

Since (1) plaintiff offers no opposition to this aspect of defendant's motion and (2) plaintiff has in fact asserted the claims made in her 2000 EEOC complaint in a separate action that is currently pending before the Honorable Richard J. Holwell, United States District Judge, *Nakis v. Potter,* 03 Civ. 8604(RJH), summary judgment is also granted to the extent plaintiff is attempting to assert here the claims made in her 2000 EEOC complaint . [4]

[4]   In Docket No. 03 Civ. 8604, plaintiff has expressly alleged a claim for constructive discharge (Complaint in *Nakis v. Potter,* Docket No. 03 Civ. 8604, ¶ 24). Accordingly, that claim is not before me in this action.

### C. *Plaintiff's Prima Facie Case*

#### 1. *Non-Environmental Claims*

a. *Failure-to-Accommodate Claims*

Claims under the Rehabilitation Act asserting a failure to accommodate are assessed under the same standards that are applicable to such claims under the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 794(d), *incorporating by reference* 42 U.S.C. § 12112(a); *Francis v. City of Meriden,* 129 F.3d 281, 285 n. 4 (2d Cir.1997). *See Baber v. Runyon, supra,* 1998 WL 912065 at *3.

The Rehabilitation Act, like the ADA, requires an employer to provide reasonable accommodations for qualified employees with a disability. 29 U.S.C. § 794(d), *incorporating by reference* 42 U.S.C. § 12112(b)(5)(A). The Second Circuit has set forth an employee's burden for establishing a *prima*

*facie* case based on an employer's alleged failure to provide a reasonable accommodation:

> [The plaintiff must show:] (1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations. *See, e.g., Lyons v. Legal Aid Society,* 68 F.3d at 1515. The employer can defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship would be undue. The burden of proof on these two issues is on the employer.

*Stone v. City of Mount Vernon,* 118 F.3d 92, 96-97 (2d Cir.1997); *accord Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F .3d 208, 216 (2d Cir.2001); *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 (2d Cir.2000); *Fol v. City of New York,* 01 Civ. 1115(THK), 2003 WL 21556938 at *5 (S.D.N.Y. July 9, 2003).

Plaintiff here alleges that defendant failed to provide seven reasonable accommodations:

> Plaintiff was not provided with the following accommodations, which were first raised and agreed to before plaintiff accepted the Modified Network Planning Specialist Position in October of 1997:[1] Plaintiff did not receive an ergonomically designed desk until the end of February, 1998, over two months after she had returned to work and five months after it was first requested; [2] plaintiff did not receive an orthopedic chair until April of 1998, almost four months after she had returned to work, and seven months after it was first requested. In addition, [3] a handle was not placed on the

door leading to the DNO office until August of 1999, almost two years after plaintiff requested a handle; [4] plaintiff did not receive any meaningful computer training, despite the fact that it was a requirement of her modified position; [5] Farrell refused to permit plaintiff to leave five to ten minutes early each day on order to use the para-transit van provided by the New York City Transit Authority for disabled individuals; [6] Cossaro denied plaintiff's request for leave to undergo physiotherapy prescribed by her physician in January of 1998; [7] Farrell denied plaintiff's request to walk outside the building in order to exercise her atrophied leg.

**\*15**  (Plaintiff's Mem. at 28-29).

A reasonable accommodation is an alteration of some aspect of the work place that will enable an employee with a disability to perform the essential functions of her job.

> Under the ADA, an employer must be willing to consider making certain changes, or accommodations, in its ordinary work rules, facilities, or the terms and conditions of employment in order to enable a disabled individual to work. A reasonable accommodation is a change which presently or in the near future will enable a disabled employee to perform the essential functions of the job.

5 Leonard B. Sand, John S. Siffert, Walter P. Loughlin, Steven A. Reiss & Nancy Batterman, *Modern Federal Jury Instructions,* Instruction 88A-16 at page 88A-45 (2004). Whether a requested accommodation is reasonable depends on the specific circumstances of the case, *see Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1527-28 (11th Cir.1997); *Wernick v. Federal Reserve Bank,* 91 F.3d 379, 385 (2d Cir.1996), and is ordinarily a question of fact. *Williams v. Philadelphia Hous. Auth. Police Dep't,* 380 F.3d 751, 771 (3rd

Cir.2004); *Buskirk v. Apollo Metals,* 307 F.3d 160, 170 (3d Cir.2002); *see Rodal v. Anesthesia Group of Onondaga, P.C .,* 369 F.3d 113, 121 (2d Cir.2004). In addition, "[t]he ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list." *Miranda v. Wisconsin Power & Light Co.,* 91 F.3d 1011, 1016 (7th Cir.1996).

Defendant argues that claims based on his failure to provide the first, second and sixth accommodations identified above are time-barred because he allegedly failed to provide these accommodations before January 24, 1998 (*see* Section III(B)(1), above). I disagree. An accommodation cannot be considered reasonable if the employer is not permitted a reasonable amount of time to implement the accommodation. *See Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 249-50 (6th Cir.2004). It follows that a claim based on a failure to accommodate does not accrue until that reasonable time has expired or the employer has irrevocably refused to make the accommodation. At this stage of the proceedings, there is a question of fact as to when defendant's reasonable time to provide ergonomic or orthopedic furniture (the first and second requested accommodations) expired and when plaintiff's claim based on defendant's failure to provide these accommodations accrued. Therefore, it is impossible to conclude at this time that plaintiff's failure-to-accommodate claim based on the desk and chair is time-barred.[5]

[5]     Defendant also argues that the interval between plaintiff's request for ergonomic/orthopedic furniture and defendant's providing the furniture was so brief that no reasonable jury could conclude that he failed to provide the requested accommodation in a timely manner. Although, the issue appears to be a close one, I conclude that the issue should be resolved at trial. One of the factors relevant to assessing reasonableness is the ability of an employer to provide the requested accommodation; if the necessary resources are readily available to an employer, delay is more difficult to justify. I do not currently have any evidence concerning the defendant's ability to provide the requested furniture, and cannot, therefore, summarily resolve this claim.

With respect to the sixth accommodation identified above-Cossaro's alleged January 1998 denial of plaintiff's request for leave to undergo physiotherapy-defendant does not set forth any evidence establishing that Cossaro denied the request before the January 24, 1998 cut-off date. Since ambiguities

must be resolved in plaintiff's favor at this stage, I must conclude that there is a question of fact as to whether Cossaro refused this request before January 24, 1998, and this aspect of the motion must, therefore, be denied.

**\*16**     Turning to the third, fourth and seventh accommodations requested by plaintiff, defendant's motion for summary judgment is granted. With respect to the door handle, plaintiff has not offered any evidence to support an inference that the presence of a handle on the door was necessary for plaintiff to perform the essential functions of her job or to ambulate safely in defendants' facility.

Similarly, plaintiff has not offered any evidence linking the alleged deficiencies in her computer training to her disability. Additional computer training could be considered an accommodation only if it was necessary as a result of plaintiff's disability. Plaintiff, however, claims that the computer training she received was deficient because she had virtually no knowledge of computers and the training was not appropriate for entry-level computer users (Nakis Aff. ¶¶ 9, 27). Since the alleged deficiency in the training had nothing to do with plaintiff's disabilities, the failure to provide additional training cannot be characterized as the denial of a reasonable accommodation.

With respect to Farrell's refusal to permit plaintiff to walk outside the building during breaks, plaintiff has again offered no evidence establishing that she needed to walk *outside* as a result of her disability. Plaintiff avers that the problems with her leg and back prevented her from sitting for extended periods of time and that she periodically needed to stand up and walk around during the work day (Nakis Aff. ¶ 9, 35). Although the medical evidence submitted by plaintiff corroborates plaintiff's contention that she needed to walk during the day, it does not establish, or even suggest, that plaintiff had a need to walk outside (Nakis Aff. Ex. 20). Taking judicial notice of the fact that building in which plaintiff worked-the Farley Post-Office on 8th Avenue and 33rd Street-occupies a site larger than an entire city block, plaintiff has failed to offer evidence explaining how walking outside-as opposed to walking inside-was a reasonable accommodation for her disability.

A jury could find that the fifth accommodation sought by plaintiff-slightly modified arrival and departure times to accommodate the schedule of the para-transit van-is a reasonable accommodation. Defendant's argument that plaintiff could have advised the van to drop her off at

work five minutes earlier and pick her up after work five minutes later goes to the reasonableness of the accommodation requested. It does not establish that the requested accommodation was unreasonable as a matter of law. *See Parker v. Columbia Pictures Indus., supra,* 204 F.3d at 335-36 (whether modified schedule is a reasonable accommodation is a question of fact). Thus summary judgment must be denied with respect to this aspect of plaintiff's failure-to-accommodate claim.

Accordingly, to the extent defendant seeks summary judgment on plaintiff's claim that she was denied reasonable accommodations with respect to her desk, her chair, her request for a slightly modified schedule to facilitate her use of a paratransit van and her request for leave to undergo physiotherapy, his motion is denied. To the extent defendant seeks summary judgment dismissing plaintiff's claim that she was denied reasonable accommodations with respect to the door handle, computer training and permission to walk outside during breaks, defendant's motion is granted.

   b. *Claims Based on Plaintiff's Treatment*
 **\*17** Plaintiff's claim that she was the victim of discrimination in connection with the terms and conditions of her employment are properly analyzed under the now familiar framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998) (applying McDonnell Douglas analysis in ADA case); *Teahan v. Metro-North Commuter R.R.,* 951 F.2d 511, 514 (2d Cir.1991); *Morris v. City of New York,* 153 F.Supp.2d 494, 500 (S.D.N.Y.2001); *Baber v. Runyon, supra,* 1998 WL 912065 at \*6. "Following the Supreme Court's directive, plaintiff must initially come forward with facts sufficient to establish a *prima facie* case that [she suffered an adverse employment action] under circumstances giving rise to an inference of discrimination." *Greenway v. Buffalo Hilton Hotel, supra,* 143 F.3d at 52.

In order to establish a *prima facie* case of discriminatory treatment, a plaintiff must show that "(1) [her] employer is covered by the [Rehabilitation Act]; (2)[she] suffers from a disability within the meaning of the [Rehabilitation Act]; (3)[she] was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [she] suffered an adverse employment action because of his disability." *Morris v. City of New York, supra,* 153 F.Supp.2d at 500; *see also Wernick v. Fed. Reserve Bank, supra,* 91 F.3d at 383; *Johnson v. City of New York,* 02 CV 1014(SJ)(FLB), 326 F.Supp.2d 364, 368 (E.D.N.Y.2004); *Bobrowsky v. New York City Bd. of Educ.,* 97 CV 874(FB), 1999 WL 737919 at \*4 (E.D.N.Y. Sept. 16, 1999).

With respect to the fourth element of a prima facie case, the nexus between the disability and the adverse employment action need not be direct, nor is there any requirement that the discriminatory animus be the sole cause of the decision.
To satisfy the fourth element ... a plaintiff may establish that the decision was motivated by his disability by demonstrating that "the disability caused conduct that, in turn, motivated" the employer's decision. *Sedor v. Frank,* 42 F.3d 741, 746 (2d Cir.1994); *see also Greene v. New York,* 1998 WL 264838, \*5 (S.D.N.Y. May 22, 1998). Moreover, the Second Circuit has held that to establish a prima facie case of discrimination based on disability, a plaintiff need not prove that disability was the sole but-for cause for the employer's decision. *See Parker,* 204 F .3d at 336-37. Instead, a plaintiff "must show only that disability played a motivating role in the decision." *Id.* at 337.

*Morris v. City of New York, supra,* 153 F.Supp.2d at 500.

"The burden of establishing a *prima facie* case is not a heavy one. One might characterize it as minimal." *Carlton v. Mystic Transp. Inc., supra,* 202 F.3d at 134. *See Galabya v. New York City Bd. of Ed.,* 202 F.3d 636, 639 (2d Cir.2000); *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997) (*per curiam*); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (describing the burden of production as *de minimis* ).

 **\*18** Although the *McDonnell Douglas* analysis has three steps in total, it is unnecessary to address steps two and three because defendant's argument is limited to the sufficiency of plaintiff's *prima facie* case. Specifically, defendant argues that plaintiff's *prima facie* case is deficient in two respects: (1) due to her excessive absenteeism, plaintiff was not otherwise qualified for the position she held with the Postal Service, and (2) plaintiff has not offered any evidence that she suffered an adverse employment action as a result of her disabilities. Defendant makes two contentions in connection with the latter argument: (a) there is no evidence of an adverse employment action and (b) there is no evidence that any adverse employment action was even partially the product of discriminatory animus. For purposes of this motion only, defendant concedes the other elements of a *prima facie* case.

Defendant's argument that plaintiff's absenteeism rendered her unqualified is problematic. First, there is a substantial

body of law addressing this issue, which neither side has addressed, holding that excessive absenteeism may not defeat a *prima facie* case in a disability discrimination case where the employee's absence is the result of the employer's failure to provide a reasonable accommodation. *Lyons v. Legal Aid Soc.,* 68 F.3d 1512, 1516 (2d Cir.1995); *see also Morris v. City of New York, supra,* 153 F.Supp.2d at 502 ("Where the employer was aware that an employee's absences were related to a disability, however, the employee's attendance record may be an impermissible pretext for the employee's disability."). Neither side has addressed the issue of whether there is sufficient evidence to sustain a jury's finding that plaintiff's absences were the result of defendant's failure to provide reasonable accommodations for plaintiff.

Second, a substantial portion of the allegedly disqualifying absenteeism did not exist throughout the period of allegedly discriminatory treatment. Defendant does not claim that plaintiff lacked the knowledge and skill to perform the essential functions of her job. The only allegedly disqualifying fact asserted by defendant is plaintiff's absenteeism, including her absence from September 29, 1999 through her retirement in November 2000. However, this prolonged absence did not exist before September 1999. Although an employee's failure to appear regularly at work may justify termination, *see e.g., Equal Employment Opportunity Comm'n v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 949-50 (7th Cir.2001); *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 682 (8th Cir.2001); *Carr v. Reno,* 23 F.3d 525, 530-31 (D.C.Cir.1994); *Mescall v. Marra,* 49 F.Supp.2d 365, 374 (S.D.N.Y.1999), it is difficult to understand how an extended absence could render an employee unqualified during the time period prior to the extended absence. If defendant's argument were true, the abandonment of a job or a constructive discharge would always defeat a claim for discriminatory treatment occurring before the abandonment or discharge, a result which cannot be correct.

**\*19** In light of defendant's failure to address the reasons for plaintiff's absence and defendant's failure to explain how a plaintiff's extended absence rendered her unqualified during the period prior to that absence, I decline to grant summary judgment on the theory that plaintiff was not "otherwise qualified."

Turning to defendant's argument that there is insufficient evidence in the record to sustain a finding that plaintiff suffered an adverse employment action under circumstances giving rise to an inference of disability-based discrimination, plaintiff asserts that the following seven incidents, in the aggregate, constitute adverse employment actions:

> [1] plaintiff was advised by the Postal Service's human resource analyst and by her supervisor that she would be better off retiring; [2] plaintiff was denied computer training and logistics training that was required for Network Planning Specialists and essential to plaintiff's career advancement within the Postal Service; [3] plaintiff received damaging mid-year evaluation in June 1999, while on leave due to an on-the-job injury; [4] plaintiff's leave and the two hours per day that she did not work were improperly charged to [leave without pay], and later to annual leave, thereby affecting plaintiff's benefits and salary; [5] plaintiff, although holding a managerial title, was relegated to performing menial, clerical tasks such as preparing form letters and placing stamps on envelopes; [6] plaintiff was not provided with keys to the employee bathroom, telephone directories and business cards, despite her requests; [7] plaintiff was berated by secretaries who were her subordinates.

(Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated December 9, 2003 ("Plaintiff's Memo."), at 31).

As noted above, defendant mounts a two-pronged attack on the allegedly adverse employment actions asserted by plaintiff. First, defendant claims that the conduct alleged by plaintiff does not rise to the level of adverse employment actions. Second, defendant argues that even if the conduct alleged rises to the level of adverse employment actions, there is no evidence to support a conclusion that the adverse actions occurred under circumstances giving rise to an inference of disability-based discrimination.

    i. *Adverse Employment Action*

2004 WL 2903718, 16 A.D. Cases 518

An adverse employment action is a materially adverse change in the terms and conditions of employment. As explained by the Honorable Shira A. Scheindlin, United States District Judge:

Examples of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). The Second Circuit has also held that lesser actions may meet the adversity threshold, but it has not explicitly defined what quantum of lesser actions constitutes an adverse employment action. *Id.* "Because there are no bright line rules as to which employment actions meet the threshold for 'adverse,' courts must make this determination on a case-by-case basis." *Wilburn v. Fleet Fin. Group, Inc.,* 170 F.Supp.2d 219, 237 (D.Conn.2001), (quoting *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 446 (2d Cir.1999)). To sustain an adverse employment action, a plaintiff must "endure[ ] a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2001) (quoting *Richardson,* 180 F.3d at 446). In order for the action(s) to be " 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities." ' *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)). A " 'material adverse change' is one that 'has an attendant negative result, a deprivation of a position or an opportunity." ' *Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 802 (E.D.N.Y.1996) (citations omitted). While adverse employment actions extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir.2002). *See also Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236 (S.D.N.Y.2001).

**\*20** *Pimentel v. City of New York,* 00 Civ. 0326(SAS), 2002 WL 977535 at \*3 (S.D.N.Y. May 14, 2002), *aff'd without published opinion,* 74 Fed. Appx. 146 (2d Cir.2003); *see Sanders v. New York City Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004); *Lawson v. Fed. Reserve Bank of New York,* 03 Civ. 1154(PKC), 2004 WL 1497567 at \*9 (S.D.N.Y. July 1, 2004); *see also de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.,* 82 F.3d 16, 21 (2d Cir.1996) (transfer to "less prestigious" unit of social services department with reduced opportunities for professional growth was adverse employment action); *Galabya v. New York City Bd. of Educ., supra,* 202 F .3d at 641 (transfer unaccompanied by decrease in compensation is not adverse employment action in the absence of evidence that

transferee position was materially less prestigious, materially less suited to employee's skills and expertise, or materially less conducive to career advancement); *Castro v. New York City Bd. of Educ. Pers.,* 96 Civ. 6314(MBM), 1998 WL 108004 at \*6-\*8 (S.D.N.Y. Mar. 12, 1998).

Judged by the foregoing standards, a number of the events asserted by plaintiff do not rise to the level of adverse employment actions. Specifically, the alleged comments by plaintiff's supervisor, the delay in providing plaintiff with bathroom keys, telephone directories and business cards and the criticism from subordinates do not rise to the level of materially adverse changes in the terms and conditions of employment. In addition, "[u]nder the law of this Circuit, a negative employment evaluation, standing alone, cannot constitute an adverse employment action." *Miller v. New York City Health & Hosp. Corp.,* 00 Civ. 0140(PKC), 2004 WL 1907310 at \*6 (S.D.N.Y. Aug. 25, 2004). *See also Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 443-44 (2d Cir.1999); *Boyd v. Presbyterian Hosp.,* 160 F.Supp.2d 522, 537 (S.D.N.Y.2001); *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 247 (S.D.N.Y.2001).

The three remaining adverse actions alleged by plaintiff-deprivation of training, treatment of leave hours and assignment to menial "make-work" tasks-appear to bear on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation. Accordingly, in light of the authorities cited above, I conclude that a jury could reasonably conclude that these events were adverse employment actions.

*ii. Inference of Discrimination*

As noted above, a *prima facie* case requires proof not only that plaintiff suffered an adverse employment action, but there must also be evidence that would support a finding that the adverse employment action occurred under circumstances that would support an inference of discrimination.

"It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable ... only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001), *citing Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79-80 (1998). *See also Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 188 (2d Cir.2001) (sex discrimination); *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001) (sex discrimination). Hostility

Nakis v. Potter, Not Reported in F.Supp.2d (2004)
Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 24 of 40
2004 WL 2903718, 16 A.D. Cases 518

or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable. *Brennan v. Metropolitan Opera Ass'n, supra,* 192 F.3d at 318 ("A plaintiff must also demonstrate that she was subjected to the hostility *because of her membership in a protected class."* (emphasis added)). Personnel decisions that are based on subjective factors or that are incorrect do not support a federal claim unless they are tainted, at least in part, by illegal discrimination. *See Bussa v. Alitalia Linee Aeree Italiane, S.P.A.,* 02 Civ. 10296(LAP), 2004 WL 1637014 at *6, *9 (S.D.N.Y. July 21, 2004).

**\*21** At the first step of the *McDonnell Douglas* analysis, there are several ways in which a plaintiff can meet her *de minimis* burden of linking the adverse employment action to illegal discrimination. The burden can be satisfied by showing that: (1) plaintiff was treated differently than similarly situated employees outside of plaintiff's protected class; (2) the employer criticized plaintiff's performance in terms that are degrading and refer to plaintiff's protected class; (3) invidious comments by the employer that refer directly or indirectly to plaintiff's protected class, or (4) a "sequence of events leading to the [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc., supra,* 239 F.3d at 468, *quoting Chambers v. TRM Copy Ctrs. Corp., supra,* 43 F.3d at 37. *See also Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999) ("A plaintiff may support an inference of ... discrimination by demonstrating that similarly situated employees [outside of plaintiff's protected class] were treated more favorably."] ). Where, as here, a plaintiff is alleging disability-based discrimination, an inference of discrimination can also be drawn from an employer's failure to provide reasonable accommodations. *Parker v. Columbia Pictures Indus., supra,* 204 F.3d at 332 ("We have ruled that failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claim, amounts to discharge 'because of' his disability.").

As noted in Section III(C)(1)(a) above, there are questions of fact concerning defendant's alleged failure to provide reasonable accommodations for plaintiff. In addition, plaintiff has offered some evidence that Cossaro said to her " 'your bones are getting old ... look I gave you good advice, but you don't listen ... you have the age. Why don't you get out?" (Nakis Aff. ¶ 51, *see also* ¶ 13). This comment could be construed as a reference to plaintiff's age, but it could also be construed as a reference to plaintiff's disability. Given that a plaintiff's burden at the first step of the *McDonnell Douglas* test is *de minimis,* I find that the foregoing evidence

is sufficient to give rise to a question of fact concerning defendant's allegedly discriminatory intent.

### iii. *Summary*

To the extent plaintiff is claiming that she was discriminated against in the terms and conditions of employment, defendant's motion is granted with respect to plaintiff's claims based on the alleged comments by plaintiff's supervisor, the alleged delay in providing plaintiff with bathroom keys, telephone directories and business cards, criticism from subordinates and plaintiff's receipt of a negative performance review in June 1999. To the extent plaintiff's discrimination claim is based on the deprivation of training, the treatment of plaintiff's leave hours and assignment to menial, "make-work" tasks, defendant's motion for summary judgment is denied.

### c. *Hostile Environment Claim*

**\*22** Finally, defendant seeks summary judgment on plaintiff's hostile environment claim.

The requirements of a hostile environment claim were exhaustively reviewed by the Court of Appeals for the Second Circuit in *Alfano v. Costello, supra,* 294 F.3d at 373-74, a case alleging gender-based hostility:

A hostile work environment claim requires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. *Leibovitz v. N.Y. City Transit Auth.,* 252 F.3d 179, 188 (2d Cir.2001) (citing *Meritor Sav, Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999). This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry,* 115 F.3d at 149 (citation

and internal quotation marks omitted). Isolated acts, unless very internal serious, do not meet the threshold of severity or pervasiveness. *Brennan,* 192 F.3d at 318; *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment"). But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir.2000) (vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes); *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).

In short, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (quoting *Perry,* 115 F.3d at 149). To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. *Harris,* 510 U.S. at 23, 114 S.Ct. 367 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"); *see also Cruz,* 202 F.3d at 570.

**\*23** Finally, it is "axiomatic" that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex. *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001); *cf. Richardson,* 180 F.3d at 440 (same as to racial discrimination).

*See also Pennsylvania State Police v. Suders,* 124 S.Ct. 2342, 2347 (2004); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270-71 (2001); *Petrosino v. Bell Atlantic,* 385 F.3d 210, 221-22 (2d Cir.2004); *Patterson v. County of Oneida, supra,* 375 F.3d at 227; *Feingold v. State of New York,* 366 F.3d 138, 150 (2d Cir.2004); *Hayut v. State Univ. of New York,* supra, 352 F.3d at 744-45.

Ordinarily, sporadic derogatory comments concerning a protected class will not support a hostile environment claim. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000). *See Bailey v. Colgate-Palmolive Co., supra,* 2003 WL 21108325 at \*22-\*23 (plaintiff's exposure over a ten-year period to the word "nigger" both through oral statements and statements in corporate documents, defendant's use of the term "nigger soap" to refer to soap of inferior quality or soap residue, co-workers's use of the terms "nigger" and "kaffa," and corporate logo for product entitled "Darkie Toothpaste" which depicted " 'a smiley, black face, black top-hatted bright-eyed minstrel,' 'held insufficient to constitute a hostile environment where such incidents were sporadic) (Motley, J.).

In determining whether the level of workplace misconduct constitutes an actionable "hostile environment," no single factor is determinative; rather, the court must consider the totality of the circumstances. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998); *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). *See also Hayut v. State Univ. of New York, supra,* 352 F.3d at 746 (hostile environment claims are "fact-specific and circumstance-driven"). Although the hostility must be based on discrimination against the plaintiff's protected characteristic, a court may consider incidents of hostility that are neutral in themselves so long as there is circumstantial or other evidence for inferring that the conduct was, in fact, the product of discriminatory animus. *Alfano v. Costello, supra,* 294 F.3d at 377-78.

A hostile environment claim requires evidence that the offensive conduct is severe and pervasive. The offensive conduct need not, however, be intolerable or unendurable. While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse* .' ' " (alteration and emphasis in the original).

**\*24** *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70 (2d Cir.2000)). "The environment need not be 'unendurable' or 'intolerable.' " *Id.* In brief, "the fact that the law requires harassment to be severe or pervasive before

2004 WL 2903718, 16 A.D. Cases 518

it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.* (quoting *Whidbee,* 223 F.3d at 70 (internal quotation marks omitted)).

*Feingold v. State of New York, supra,* 366 F.3d at 150.

Although there is no "bright line" test to determine whether there is sufficient evidence to support a finding that the objective element of a hostile environment claim has been satisfied, a brief review of some recent cases in which hostile environments were alleged is helpful to illuminate the general principals set forth above.

In *Petrosino v. Bell Atlantic, supra,* 385 F.3d at 215, the Court of Appeals found that a jury could conclude that the objective element of a hostile environment claim was satisfied where plaintiff, a female telephone installation and repairs technician, was subjected to an ongoing barrage of crude graffiti in the work place depicting sex acts, frequent disparaging remarks concerning her " 'ass,' her 'tits,' [and] her menstrual cycle," was referred to as " 'a damn woman,'' ' and was told to calm her " 'big tits down.'' '

In *Feingold v. State of New York, supra,* 366 F.3d at 145, plaintiff, a Jewish individual and former administrative law judge ("ALJ"), defeated a summary judgment motion seeking dismissal of a hostile environment claim where he offered evidence that he was denied training provided to other non-Jewish ALJ's, was assigned a heavier case load than non-Jewish ALJ's, was subjected to more stringent monitoring of time and attendance than non-Jewish ALJ's, was repeatedly referred to by " 'Jewish sounding' " misnomers such as " 'Feinstein,' ' ' 'Goldstein,' ' ' 'Goldman,' ' ' 'Silverman,' ' and " 'Feinberg,' ' and was frequently referred to as Jewish. In addition, other employees regularly proclaimed " 'Praise Jesus' ' and " 'Hallelujah' ' in the workplace while publicly informing plaintiff that he was excused from participating because he was Jewish. In addition, another employee referred to food she had been served in the Catskills as " 'Jewish pig food.'' '

In *Fitzgerald v. Henderson,* 251 F.3d 345, 350 (2d Cir.2001), a grant of summary judgment for the defendant in a hostile environment case was reversed where plaintiff alleged that the offending party regularly entered her cubicle, stood close to her, touched her shoulder, commented on her body and her appearance in shorts, asked about plaintiff's marriage, and complained that his own wife was " 'no fun.' ' The offending party also ran his fingers through plaintiff's hair, invited her

out socially, and on one occasion, unbuttoned his shirt in front of plaintiff and stated that he would father plaintiff's first child. The offending conduct allegedly lasted from six to eight months, from August 1994 through Spring 1995. 251 F.3d at 349-50.

**\*25** In *Whidbee v. Garzarelli Food Specialties, Inc., supra,* 223 F.3d 62, the Court of Appeals reversed a grant of summary judgment. In that racial discrimination case, plaintiff offered evidence that there were repeated comments in the work place that certain racial and national groups were lazy, that the town was "getting worse" because of the influx of certain racial and national groups, that an employee had a rope to hang a minority employee that he believed to be lazy, that a minority worker was " 'a lazy black snake,' 'and that the plaintiffs were " 'black sheep.'' ' 223 F.3d at 66-67. In addition, this same employee referred to the race-based torture and murder of James Byrd, Jr. in Jasper, Texas [6] and stated that he " 'should go out and buy a truck and drag someone by the truck who is black.'' ' 223 F.3d at 66-68.

[6]     On June 7, 1998, James Byrd, Jr., an African-American, was chained by his ankles to the back of a pick-up truck in Jasper Texas by Lawrence Brewer, John King and Shawn Berry, three members of a racist gang. After beating Byrd, inflicting non-fatal stab wounds and backing their truck over his body, the three assailants dragged Byrd through the streets of Jasper until his body literally disintegrated. Roy Bragg, Jasper Defendant Says Byrd's Throat Was Cut, *San Antonio Express-News,* Sept. 19, 1999, available at 1999 WL 100180604.

And in *Cruz v. Coach Stores, Inc., supra,* 202 F.3d at 570-71, an ongoing barrage of racial comments, that included the use of the words and phrases " 'nigger,' ' ' 'spics' ' and " 'Colored People's Time,' ' was sufficient to allege a racially-hostile environment. *See also Hotz v. Rockefeller & Co.,* 258 F.3d 62, 70, 75-76 (2d Cir.2001) (evidence sufficient to support a finding of gender-based hostile environment where harasser touched plaintiff in unwelcome manner on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" comments concerning plaintiff's sex life). *See generally Alfano v. Costello, supra,* 294 F.3d at 379-80 (summarizing the facts of numerous successful and unsuccessful hostile environment cases).

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 27 of 40
Nakis v. Potter, Not Reported in F.Supp.2d (2004)
2004 WL 2903718, 16 A.D. Cases 518

Defendant contends that he is entitled to summary judgment on plaintiff's hostile-environment claim because the conduct alleged by plaintiff is insufficient to meet the objective element of the claim. In addition, defendant argues that plaintiff has not shown that any hostility that may have existed was the product of disability-based animus.

In response, plaintiff cites fifteen events that she contends would support a finding of a hostile environment:
1. Plaintiff was asked to retire rather than to remain in the workforce;

2. Julie Wong, Farrell's secretary, denied her the resources required for her job;

3. Defendant refused to correct leave errors in plaintiff's personnel action forms, thereby affecting plaintiff's salary and benefits;

4. Julie Wong and Farrah Eng, who were plaintiff's subordinates, yelled and screamed at plaintiff;

5. Plaintiff was denied the opportunity to travel to logistics training in [Indianapolis] because of her "back";

6. Farrah Eng refused to provide plaintiff training in airline irregularity reports;

7. Plaintiff was ordered to use a separate entrance leading to the Distribution Networks Office;

8. Julie Wong, a secretary with a position subordinate to that of plaintiff, shouted at plaintiff in the presence of other co-workers, that no one respected plaintiff and that she worked eight hours per day;

**\*26** 9. Stein berated plaintiff for leaving her station, when in fact plaintiff had permission to leave;

10. Stein and Farrell took no actions to create a safe and hostility-free environment for plaintiff;

11. Bud Keller, a supervisor, threatened plaintiff;

12. Plaintiff's computer had been tampered with;

13. Plaintiff's work station was moved to a storage area where the copier and fax machine are maintained and where no other Network Distribution Specialists were assigned;

14. Stein responded to plaintiff's request for an overhead light bulb by stating "What do you need more light for? You have no assignments";

15. Carole Lee berated plaintiff, warned her not to get on her "bad side," and told her to go to hell.

(Plaintiff's Mem. at 32-33).

For the reasons set forth below, I conclude that these events are insufficient to sustain a finding of a hostile environment.

Items 2, 3, 5, 6, 7 and 13, even when considered in conjunction with the other evidence, do not establish a finding of a hostile environment. The alleged denial of resources consisted of a short delay in providing plaintiff business cards, telephone books and keys to the employee restroom. This conduct, like the denial of training described in items 5 and 6, the salary miscalculation described in item 3 and the relocation of plaintiff's desk described in item 13 are not abusive and are too trivial to support a finding of hostility. At worst, they are garden-variety work place occurrences in which the employee disagrees with an employer's decision. The instructions to plaintiff to use a separate entrance was a response to the fact that plaintiff had had an accident when using another entrance. None of these acts are objectively hostile and do not even approach the grossly abusive conduct that has been found in other cases to satisfy the objective element of a hostile-environment claim.

With respect to conduct committed by individuals other than plaintiff's supervisors, *i.e.*, items 4, 8, and 15, there is no evidence of disability-based animus. As noted above, disability-based animus may be inferred from an employer's refusal to provide a reasonable accommodation, and the questions of fact concerning whether plaintiff was afforded certain reasonable accommodations give rise, in turn, to questions of fact concerning discriminatory animus. However, there is no evidence that individuals Wong, Eng and Lee-the individuals who played a role in items 4, 8 and 15-played any role concerning the accommodations allegedly denied to plaintiff. Thus, even if the denial of these accommodations does support an inference of discrimination, it does not support an inference of discrimination with respect Wong, Eng and Lee since they did not deny the accommodations and there is no other evidence suggesting that Wong, Eng or Lee were motivated by disability-based bias.

Nakis v. Potter, Not Reported in F.Supp.2d (2004)
Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 28 of 40
2004 WL 2903718, 16 A.D. Cases 518

The six remaining events, items 1, 9, 10, 11, 12 and 14, even if they constituted unjustified criticism, would not support a jury finding that "the workplace was so severely permeated with discriminatory intimidation, ridicule and insult that the terms and conditions of [plaintiff's] employment were thereby altered." *Alfano v. Costello, supra,* 294 F.3d at 373. These sporadic incidents were not objectively severe, did not refer to plaintiff in a way that demeaned her on the basis of her disability, and did not involve a physical threat or humiliation. At worst, these incidents evidence poor workplace management and do not rise to the level of a hostile environment.

## IV. *Conclusion*

**\*27**  Accordingly, for all the foregoing reasons, defendant's motion for summary judgment is granted:

(1) dismissing all non-environmental claims based on conduct occurring prior to January 24, 1998;

(2) dismissing plaintiff's claim asserted in her 1999 EEOC complaint that her injury compensation was "totally messed up;"

(3) dismissing without prejudice plaintiff's constructive discharge claim and the other claims asserted in her 2000 EEOC Complaint and in Docket No. 03 Civ. 8604;

(4) dismissing plaintiff's claim that she was denied reasonable accommodations to the extent that it is based on defendant's failure to install a door handle and provide computer training and his refusal to permit plaintiff to walk outside during breaks;

(5) dismissing plaintiff's disparate treatment claim to the extent that it is based on

(a) comments by plaintiff's supervisor that she would be better off retiring,

(b) the delay in providing plaintiff with bathroom keys, telephone directories and business cards,

(c) criticism from subordinates, and

(d) receipt of a negative employment evaluation in 1999;

(6) dismissing plaintiff's hostile environment claim.

In all other respects defendant's motion for summary judgment is denied.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2903718, 16 A.D. Cases 518

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5191394
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Garry RISSMAN, Plaintiff,

v.

Michael CHERTOFF et al., Defendants.

No. 08 Civ. 7352(DC).
|
Dec. 12, 2008.

West KeySummary

1    **Civil Rights** 🔑 Particular Cases

An airport luggage screener could not maintain
an employment discrimination claim since
discrimination based on an individual's sexual
orientation or perceived sexual orientation was
not actionable under federal law. Though
individuals may maintain a claim under Title
VII for adverse employment actions caused by
their lack of conformity to gender stereotypes,
the screener did not allege any facts that
would support a gender discrimination claim. 42
U.S.C.A. § 2000e et. seq.

27 Cases that cite this headnote

**Attorneys and Law Firms**

Garry Rissman, New York, NY, pro se.

**MEMORANDUM DECISION**

CHIN, District Judge.

**\*1** *Pro se* plaintiff Garry Rissman filed a complaint on
August 19, 2008, against defendant Michael Chertoff under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e
et. seq., and for alleged violations of his Fifth Amendment
rights under *Bivens v. Six Unknown Agents of the Fed. Bureau
of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
(1971). Upon review of the complaint, I ordered plaintiff to

show cause why his Title VII claim for discrimination based
on sexual orientation or perceived sexual orientation and his
*Bivens* claim should not be dismissed. Plaintiff submitted a
response on November 5, 2008. He also filed an amended
complaint on November 3, 2008, naming nine additional
defendants, and adding a defamation claim against defendant
John Allen. As defendants have not answered, plaintiff has the
right to file an amended complaint. His amended complaint is
accepted, and I consider the merits of the amended complaint.

Plaintiff has now had two opportunities to articulate a claim.
Upon review of plaintiff's amended complaint, as well as his
November 5, 2008 response to my order to show cause, I
am dismissing the amended complaint *sua sponte* for failure
to state a claim upon which relief may be granted. My
reasons are as follows: first, plaintiff may not maintain a
claim for employment discrimination (including any hostile
work environment claim) based on his sexual orientation or
perceived sexual orientation; second, plaintiff fails to allege
sufficient facts to assert a plausible claim for employment
discrimination (including hostile work environment) based
on race, religion, or age; third, plaintiff's *Bivens* claim is
time-barred by the applicable statute of limitations; and
fourth, plaintiff's defamation claim is also time-barred by the
applicable statute of limitations.

**BACKGROUND**

Plaintiff was employed from September 1, 2002, to July 27,
2004, by the Transportation Security Agency ("TSA") as a
passenger and luggage screener at LaGuardia International
Airport in Queens, New York. (Am.Compl.¶ 19). He is a
white, Jewish, gay male who was 48 years old when he
commenced working at TSA. (*Id.* ¶ 21). He contends that
during his employment with TSA, he was discriminated
against on the basis of his race, religion, age, sexual
orientation, and perceived sexual orientation, and he was
denied equal protection of the laws. He also contends
defendant Allen lied about him during TSA's investigation
into his discrimination claims. (*Id.* ¶¶ 34-35).

**DISCUSSION**

**A.** *Pleading Standard*
At the pleadings stage, plaintiff's amended complaint must
only satisfy Fed.R.Civ.P. 8(a), which calls for "a short and
plain statement of the claim," and allege " 'enough facts to

state a claim for relief that is plausible on its face.' " *Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) (quoting *Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1975, 167 L.Ed.2d 929 (2007)). A *prima facie* case is not required. *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 343 (2d Cir.2006).

**\*2** Here, neither plaintiff's complaint nor his response to my order to show cause asserts facts sufficient to state a plausible claim for relief. Even according *pro se* plaintiff's amended complaint the leniency it is due and interpreting it "to raise the strongest arguments that [it] suggest[s]," plaintiff's amended complaint fails to state a claim upon which relief can be granted. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotations omitted).

**B.** *Employment Discrimination*

**1.** *Sexual Orientation Discrimination*
As discussed in my September 22, 2008 order to show cause, employment discrimination and workplace harassment based on an individual's sexual orientation or perceived sexual orientation are not actionable under federal law. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 217-18 (2d Cir.2005). Though individuals may maintain a claim under Title VII for adverse employment actions caused by their lack of conformity to gender stereotypes, *id.* at 218, plaintiff does not allege any facts that would make out a case for gender discrimination under Title VII. Therefore, plaintiff's claims alleging discrimination and hostile work environment because of his sexual orientation or perceived sexual orientation are dismissed.

**2.** *Race, Religion, Age Discrimination*
Plaintiff's claims of employment discrimination and hostile work environment on the basis of his race, religion, and age are also dismissed for failure to allege facts sufficient to state a plausible claim. Plaintiff alleges a litany of facts regarding his mistreatment by co-workers and supervisors at TSA in LaGuardia Airport. He states that although his work was above average in quality (Am.Compl.¶¶ 36-38), he was frequently reprimanded without justification by his supervisors and co-workers in the presence of others, including passengers (*id.* ¶¶ 27, 44-45, 47, 56, 59). Plaintiff describes specific instances where he was reprimanded without justification, but he does not allege any facts establishing that this mistreatment was prompted by animus towards him because of his race, religion,

or age. Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law. *See Fridia v. Henderson,* No. 99 Civ. 10749(BSJ), 2000 WL 1772779, at \*6 (S.D.N.Y. Nov.30, 2000) ("not every unpleasant matter creates a cause of action"). To be actionable under Title VII or the Age Discrimination in Employment Act (the "ADEA"), abusive conduct in the workplace must have occurred at least in part because of plaintiff's membership in a protected class. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 76 (2d Cir.2001); *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999); *Ford v. New York City Dep't of Mental Health & Hygiene,* 545 F.Supp.2d 377, 393 (S.D.N.Y.2008). The statutes prohibit discrimination; they do not constitute civility codes. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**\*3** The few facts alleged by plaintiff relating to his race or religion do not amount to more than stray remarks made by co-workers and cannot support a plausible claim of hostile work environment. *See Petrosino v. Bell Atl.,* 385 F.3d 210, 223 (2d Cir.2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). For instance, plaintiff alleges that when he remarked that the Mel Gibson-directed movie *Passion of the Christ* was "the most anti-semitic [sic] movie ever made, one female screener ... said: 'Your Rabbi told you to say this!' " (Am.Compl.¶ 76). Plaintiff also states he heard "many comments to make him feel left out as one of the few non-Hispanic white persons." (*Id.* ¶ 80). Even interpreting these factual allegations "to raise the strongest arguments they suggest," *Graham v. Henderson,* 89 F.3d at 79, they do not state a plausible claim for a hostile work environment "permeated with discriminatory intimidation, ridicule, and insult ... that was sufficiently severe or pervasive to alter the conditions of ... employment" and create an abusive working environment. *Petrosino,* 385 F.3d at 223 (internal quotation marks and citations omitted).

Nor does plaintiff allege a plausible claim that he suffered adverse employment action because of his race, religion, or age. Instead of pleading facts regarding defendants' discriminatory animus, plaintiff merely makes conclusory statements attributing discriminatory intent to defendants' actions. For instance, plaintiff alleges:

[T]he very fact that Plaintiff was constantly screamed at by TSA employees for being too "thorough" must be the ultimate red flag that he was being discriminated

against. Is there any sphere of federal activity where quality work is penalized? If a staff physician at a Veterans' Administration hospital were too "thorough" during surgery and thereby had a zero mortality rate, would he then be penalized or rewarded? Would such a physician receive a recommendation letter? Plaintiff knows from his life experience that such good work would be rewarded. Such a physician would also have been given a very strong recommendation letter without even having to ask.

Therefore, Plaintiff was discouraged repeatedly from applying for the position for Lead Screener because of his race, religion, and sexual orientation....

(Am.Compl.¶¶ 38-39).

He also alleges:

No one cared to even listen to Plaintiff's point of view, which is the "reason d'etre" of this suit. The powers that be, [defendants] John Allen and John Ellison already made up their made [sic] before they even spoke to Plaintiff. Not once did they let him speak at length. They badgered and scolded Plaintiff for hours as if he were a terrorist in a poorly written "B" movie script.

This was the most extreme example of a constant and one-sided harassment of Plaintiff and intentional infliction of a hostile work environment, which was perpetrated by Defendants because of Plaintiff's race, religion and sexual orientation in violation of Title VII and the Fifth Amendment....

**\*4**  (*Id.* ¶¶ 69-70).

Without support, plaintiff concludes that defendants:

> [I]nflicted this hostile work environment upon Plaintiff in a deliberate attempt to induce him to resign his employment because they did not want an effeminate, gay, Jewish older white male working together with them in the same team.

(*Id.* ¶ 50). He also speculates he "is certain [defendant Annette Torres] would not have yelled at Plaintiff had he been either heterosexual or an African American as she was." (*Id.* ¶ 58).

In essence, plaintiff alleges that because he was yelled at, this must have been because he was "an effeminate, gay, Jewish older white male." Such conclusory and speculative statements are insufficient. While the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff, *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996), "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and are insufficient to state a claim for which relief may be granted. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291(SHS), 2004 WL 2210269, at \*10 (S.D.N.Y. Sept.30, 2004) (quoting *Citibank, N.A., v. Itochu Int'l Inc.,* No. 01 Civ. 6007(GBD), 2003 WL 1797847, at \*1 (S.D.N.Y. Apr.4, 2003)).

Accordingly, plaintiff's claims alleging violation of his rights under federal employment law are dismissed.

**B.** *Bivens* **Claim**

Plaintiff's *Bivens* claim for violations of his right to equal protection is dismissed because it is time-barred by the applicable statute of limitations. A three-year statute of limitations under New York C.P.L.R. § 214(5) applies to *Bivens* actions brought in federal district court in New York. *Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987). Plaintiff worked as a screener for TSA at LaGuardia International Airport until July 27, 2004. (Am.Compl.¶ 19). The entirety of his *Bivens* claim arises from events that occurred while he was working at the airport.

Accordingly, to the extent that plaintiff's *Bivens* claim is distinct from his statutory employment discrimination claims, it is time-barred. [1] Even assuming any alleged constitutional violations were of a continuing nature that lasted until the date of his departure, plaintiff's *Bivens* claim is time-barred because he filed this action on August 19, 2008, more than four years after he stopped working at the airport.

[1]    To the extent plaintiff's *Bivens* claim concerns employment discrimination (including hostile work environment) at TSA, Title VII and the ADEA are his exclusive remedies and no *Bivens* cause of action may lie. *See Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding Title VII to be the "exclusive judicial remedy for claims of discrimination in federal employment"); *Briones v.*

2008 WL 5191394

*Runyon,* 101 F.3d 287, 289 (2d Cir.1996) ("Title VII is the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin."); *Bumpus v. Runyon,* No. 94 Civ. 2570(DC), 1997 WL 154053, at *4 (S.D.N.Y. April 2, 1997) ("ADEA provides the exclusive remedy for federal employees who allege age discrimination.").

### C. *Defamation*

Plaintiff's defamation claim against Allen is also dismissed as time-barred. Under New York law, an action to recover damages for defamation must be commenced within one year of the publication of the allegedly defamatory material. *See* N.Y. C.P.L.R. § 215(3); *Shamley v. ITT Corp.,* 869 F.2d 167, 172 (2d Cir.1989). When the plaintiff actually discovers the publication is not relevant. *See Memory's Garden, Inc. v. D'Amico,* 84 A.D.2d 892, 892, 445 N.Y.S.2d 45 (3d Dep't 1981); *Rand v. New York Times Co.,* 75 A.D.2d 417, 424, 430 N.Y.S.2d 271 (1st Dep't 1980). The cause of action accrues on the date of the utterance.

*5 Plaintiff alleges Allen lied in a written statement he made to a TSA investigator who was investigating plaintiff's employment discrimination claims. (Am.Compl.¶¶ 34-35). The statement was signed by Allen on November 2, 2005, and the report of investigation was submitted December 22, 2005. (*Id.* Ex. B at F-4). Accordingly, any claim plaintiff may have against Allen for making false factual statements is barred by the one-year statute of limitations.

### *CONCLUSION*

For the reasons set forth above, plaintiff's amended complaint is dismissed, with prejudice and without costs. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 5191394

---

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)

2019 WL 2028701

KeyCite Yellow Flag

Disagreed With by  Lax v. City University of New York,  N.Y.Sup.,
August 25, 2022

2019 WL 2028701
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Nancy COLAS, Plaintiff,

v.

CITY OF UNIVERSITY OF NEW YORK, and
Kingsborough Community College, Defendants.

17-CV-4825 (NGG) (JO)
|
Signed 05/07/2019

**Attorneys and Law Firms**

Chauncey D. Henry, Henry Law, Garden City, NY, for
Plaintiff.

Evan Michael Piercey, NYC Law Department, New York,
NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge

 **\*1**  Plaintiff Nancy Colas, a former assistant teacher at
the Kingsborough Community College Child Development
Center, brings this action under the Americans with
Disabilities Act, 42 U.S.C. §§ 12101, et seq. (the "ADA"),
Section 504 of the Rehabilitation Act of 1973, 29 § U.S.C.
794a(a) ("Section 504"); the Civil Rights Act of 1964,
42 U.S.C. §§ 2000(e) et seq. ("Title VII"), the Pregnancy
Discrimination Act of 1978, 42 U.S.C. § 2000e(k), (the
"PDA"), the New York State Human Rights Law, N.Y.
Exec. Law § 290, et seq. ("NYSHRL"), and the New York
City Human Rights Law, N.Y.C. Admin. Code § 8-101, et
seq. ("NYCHRL"), alleging that Defendants Kingsborough
Community College ("KCC") and the City University of New
York ("CUNY") discriminated against her because of her
pregnancy. (Am. Compl. (Dkt. 18) ¶¶ 1, 66-118.) Defendants
move to dismiss the complaint for failure to state a claim.
(See Defs. Mot. to Dismiss ("Defs. Mot.") (Dkt. 24).) For
the reasons stated below, Defendants' motion is GRANTED IN
PART and DENIED IN PART.

**I. BACKGROUND**
The court takes the following statement of facts from
Plaintiff's amended complaint, the well-pleaded allegations of
which the court generally accepts as true for purposes of the
motions to dismiss. See N.Y. Pet Welfare Ass'n v. City of New
York, 850 F.3d 79, 86 (2d Cir. 2017).

Plaintiff formerly worked as an assistant teacher at the KCC
Child Development Center (the "Center"), a child-care center
for KCC students' children. (Am. Compl. ¶¶ 14-16.) Plaintiff's
responsibilities included preparing meals for the students,
assisting students to and from the restroom, cleaning the
classroom space, and managing classroom activities. (Id. ¶
17.) Plaintiff alleges that in May 2016 she informed the
head teacher in her classroom, Jennifer Clapp, that she was
pregnant, but did not feel comfortable talking about it, as she
was only in her first trimester. (Id. ¶ 23.) Plaintiff contends
that she then asked to speak with Center director Heather
Brown, who speculated that the subject of the conversation
was "you leaving us" and "something that will arrive in nine
months." (Id.)

Plaintiff alleges that during her pregnancy and in the course
of her employment at the Center, she suffered pregnancy-
related medical conditions including "periodic leg muscle
spasms, neck pain, fatigue and shortness of breath, episodes of
cramping and contractions, ligament pain, back pain, [ ] joint
pain, nausea and headaches." (Id. ¶ 24.) Plaintiff states that
these medical complications resulted in "atypical pregnancy
symptoms" including impaired functioning with her "baseline
walking pattern, speed, circulation and coordination and
balance." (Id.) As a result of these complications, Plaintiff
alleges that she required frequent rest periods and "other
reasonable accommodations due to the medical conditions
related to pregnancy." (Id. ¶ 25.)

Plaintiff alleges that as her pregnancy progressed, Clapp and
Brown (1) chided her for taking frequent restroom breaks
such that she held her "bladder and bowel movements to
the near point of self-urination or defecation, [and] to the
point of intense and severe physical pain" (id. ¶ 28); (2)
admonished her for sitting down during classroom hours
(id. ¶¶ 31-32); (3) refused to relieve her from manual labor
and/or assigned new manual labor tasks to her that she was
not required to do prior to her pregnancy (id. ¶ 33); (4)
did not permit her to eat breakfast in the. classroom despite
the fact that Defendants' similarly situated non-pregnant
employees were permitted to eat in the classroom (id. ¶¶

Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)

2019 WL 2028701

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 34 of 40

37-38); and (5) subjected her to "unwarranted and uninvited insulting comments, mocking behavior, and unprecedented and unwarranted informal and formal meetings regarding [her] work performance," including reproaching her for having less interaction with students (id. ¶ 39; see id. ¶¶ 39-46). As a result of this treatment, Plaintiff alleges that she had to report her "work stress" to her medical doctor and "found her body shivering and jittering throughout the day." (Id. ¶ 50).

**\*2** Plaintiff alleges that she "sought to file a complaint with the Human Resources Department" but was discouraged from doing so by a coworker. (Id. ¶¶ 60-61.) Plaintiff also alleges that she complained to Brown about Clapp's unprofessional conduct but that Brown told her to take these concerns up directly with Clapp. (Id. ¶ 58.) Plaintiff claims that she was constructively terminated "on or about July 13, 2016, as a result of severe work-related stress, hostility and discrimination." (Id. ¶ 62.)

## II. PROCEDURAL HISTORY

Plaintiff filed her initial complaint with this court on August 16, 2017. (Compl. (Dkt. 1).) On March 26, 2018, Plaintiff filed an amended complaint. (Am. Compl.) On July 2, 2018, Defendants filed a motion to dismiss Plaintiff's amended complaint with Plaintiff's memorandum in opposition, and Defendants reply in support of their motion to dismiss. (See Defs. Not. of Mot. to Dismiss (Dkt. 24); Pl. Mem. in Opp. ("Pl. Mem.") (Dkt. 27); Defs. Reply ("Defs. Reply") (Dkt. 28).)

## III. LEGAL STANDARD

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (per curiam). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

In reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005). "[W]hatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (citation and internal quotation marks omitted). [1]

[1] Defendants' contend that Plaintiff's usage of "upon information and belief" before nearly every factual assertion renders the complaint "insufficient as a matter of law and subject to dismissal." (Mot. at 19-20.) In this particular case, it is clear that the use of the phrase "upon information and belief" as a qualifier with respect to the pleadings is a stylistic error. As Defendants point out, Plaintiff uses the phrase "upon information and belief" prior to facts that she is undoubtedly aware of, including the date she became aware of her pregnancy and the date she received an Equal Employment Opportunity Commission ("EEOC") right to sue letter. Therefore, this court declines to dismiss Plaintiff's complaint on this basis alone. (Mot. at 19; Compl. ¶¶ 5; 23). See also Wu v. Pearson Educ., Inc., No. 09-CV-6557 (RJH), 2010 WL 3791676, at \*6 (S.D.N.Y. Sept. 29, 2010) (finding that "although the number of qualifiers is at times excessive, [Plaintiffs'] style of writing does not impede the reader's ability to understand the allegations made.").

## IV. DISCUSSION

### A. Section 504 and ADA Disability Discrimination Claims

**\*3** Title I of the ADA prohibits employers from discriminating against any "qualified individual with a disability because of the disability of such individual in regard to" any aspect of employment. 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must show: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff

was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005). Similarly, to plead a case under Section 504 "a plaintiff must allege: (1) that he or she is a person with disabilities under the Rehabilitation Act, (2) who has been denied benefits of or excluded from participating in a federally funded program or special service, (3) solely because of his or her disability." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 216 (2d Cir. 2012). Claims of disability discrimination pursuant to the Rehabilitation Act are analyzed under the same standards as claims brought under the ADA. Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016).

Defendants move to dismiss Plaintiff's ADA and Section 504 claims on the ground that pregnancy does not constitute a disability under either the ADA or the Rehabilitation Act. (Mot. at 8-9). The ADA defines a "disability" as, inter alia, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1). "Major life activities" include "eating, sleeping, walking, standing, lifting," and other activities. § 12102(2)(A); see 29 C.F.R. § 1630.2(i). The EEOC has stated that courts should determine whether an impairment "substantially limits" a "major life activity as compared to most people in the general population," without regard to "the ameliorative effects of mitigating measures" other than glasses or contact lenses. 29 C.F.R. § 1630.2(j)(ii), (vi). The term "substantially limits" should be "construed broadly in favor of expansive coverage" and the inquiry into this threshold issue "should not demand extensive analysis." Id. § 1630.2(j)(i), (iii).

While pregnancy alone is not considered a disability, pregnancy-related impairments may qualify as ADA disabilities if they substantially limit "a major life activity." Wadley v. Kiddie Acad. Int'l, Inc., No. 17-CV-05745, 2018 WL 3035785, at *5 (E.D. Pa. June 19, 2018). Before 2008, courts routinely held that medical conditions associated with a typical pregnancy did not qualify as a disability under the ADA. See, e.g., Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 553 (7th Cir. 2011) (applying ADA in effect prior to the 2008 amendments to hold that "[c]ourts that consider these regulations consistently find that pregnancy, absent unusual circumstances, is not a physical impairment" (collecting cases)). See also Jeannette Cox, Pregnancy as "Disability" and the Amended

Americans with Disabilities Act, 53 B.C. L. Rev. 443, 467-72 (2012) (discussing how the 2008 amendments to the ADA drastically expanded its scope, making it much easier for pregnancy-related medical conditions to qualify under its provisions); Joan C. Williams, Robin Devaux, Danielle Fuschetti, & Carolyn Salmon, A Sip of Cool Water: Pregnancy Accommodation After the ADA Amendments Act, 32 Yale L. & Pol'y Rev. 97, 123 (2013). However, the EEOC's post-ADAAA enforcement guidelines on pregnancy discrimination makes clear that "some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended." EEOC No. 915-003, Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *19 (June 25, 2015) ("2015 Enforcement Guidance"). In fact, "a number of pregnancy-related impairments that impose work-related restrictions will be substantially limiting, even though they are only temporary." Id. Examples include pregnancy-related anemia, sciatica, carpal tunnel syndrome, gestational diabetes, nausea sufficient to cause severe dehydration, abnormal heart rhythms, swelling, depression, and cervical insufficiency as well as post-partum related impairments. Id. at *20. Likewise, EEOC guidance establishes that "a pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the definition" or "may constitute a 'record of' a substantially limiting impairment or may be covered under the 'regarded as' prong if it is the basis for a prohibited employment action and is not 'transitory and minor.' " 29 C.F.R. Pt. 1630, App. § 1630.2(h)(2014). "Thus, where a medical condition arises out of a pregnancy and causes an impairment separate from the symptoms associated with a healthy pregnancy, or significantly intensifies the symptoms associated with a healthy pregnancy, such medical condition may fall within the ADA's definition of a disability." Mayorga v. Alorica, Inc., No. 12-CV-21578, 2012 WL 3043021, at *5 (S.D. Fla. July 25, 2012).

*4 Here, Plaintiff has alleged sufficient facts to state a plausible claim for relief under the ADA and Section 504 for a pregnancy-related medical complication. Defendants contend that Plaintiff fails to allege that her "pregnancy-related medical conditions" differ from those "conditions which accompany a typical pregnancy." (Mot. at 9.) The court disagrees. Plaintiff alleges, for example, that as a result of her "leg muscle spasms, neck pain, fatigue and shortness of breath, episodes of cramping and contractions, ligament pain, back pain, along with joint pain, nausea and headaches" her "function was greatly altered, namely in her

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 36 of 40
Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)
2019 WL 2028701

baseline walking pattern, speed, circulation and coordination of balance." (Am. Compl. ¶ 24). Plaintiff contends that such symptoms are "atypical pregnancy symptoms." (Id.). In light of the ADAAA's lenient standards to establish a disability, and the liberal pleading standards of Rule 8, the court finds that Plaintiff has alleged sufficient facts to plead that she had a disability under both the ADA and Section 504. See Nagle v. E. Greenbush Cent. Sch. Dist., No. 116-CV-00214, 2018 WL 4214362, at *16 (N.D.N.Y. Feb. 21, 2018) (finding that the plaintiff was disabled as a result of serious health issues faced by pregnancy complications). See also Varone v. Great Wolf Lodge of the Poconos, LLC, No. 3:15-CV-304, 2016 WL 1393393, at *3 (M.D. Pa. Apr. 8, 2016) (finding that allegations that the plaintiff had to "stand for long periods of time and [had] pain and cramping in her legs, along with cramping and pain throughout her stomach and chest, that she suffered anxiety and stress, and that she was limited in her ability to perform major life activities, including her ability to lift, stop, walk, turn, think, concentrate, bend, care for herself, sit and stand for long periods of time and relate to others" sufficiently set forth a claim under the ADA.) Because defendants do not move to dismiss Plaintiff's disability discrimination claim on any other basis, the court denies Defendants' motion to dismiss Plaintiff's ADA and Section 504 discrimination claims.

### B. Failure to Accommodate Claim

Courts apply the same standard for failure to accommodate cases under the ADA and the Rehabilitation Act. See Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999). An employer is liable for a failure to accommodate if: "(1) [the] plaintiff is a person with a disability under the meaning of the [applicable statute]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013). Defendants object to Plaintiff's failure to accommodate claim on two grounds: (1) Plaintiff has failed to establish that she was disabled within the meaning of the ADA or ADAAA; and (2) Plaintiff's accommodation claim is based on "unsupported conclusory allegations." (Mot. at 10). For the reasons set for above, Plaintiff has plausibly alleged she was disabled within the meaning of the ADA or ADAAA and therefore this court will proceed to address Defendants' second ground.

Defendants contend that "[n]owhere does Plaintiff explain who she made her accommodation request to, what she was actually requesting, what, if anything, was the substance of the alleged denial of her accommodation requests, or any supporting details whatsoever, rendering such a request too vague to support a failure to accommodate claim." (Id.) However, Plaintiff alleges that she requested the following accommodations:

- The ability to more regularly take bathroom breaks (Am. Compl. ¶¶ 28-30);

- The ability to take regular sitting breaks (Id. at ¶¶ 31-32); and

- The ability to limit her role in duties that required "continuous bending and lifting resulting in burdensome physical hardship" (Id. at ¶¶ 33-36).

Plaintiff further alleges that she was explicitly denied these accommodations. For instance, Plaintiff alleges that, as a result of the physical hardship, she "complained to Defendant to no avail." (Id. ¶ at 33). Plaintiff also states that she requested not to stoop or squat in the classroom to assist students but that such accommodation requests were denied. (Id. ¶ at 34). Finally, Plaintiff alleges that "she informed Director Brown that she is performing her job duties, however required several accommodations in order to offset any burdens or challenges resulting from her pregnancy and [its] complications." (Id. ¶ at 56). These allegations are sufficient to plead that Plaintiff sought accommodations.

As Defendants point out, it is generally the "responsibility of the individual with a disability to inform the employer that an accommodation is needed." Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006) (citations omitted). However, that rule does not apply where "the disability is obvious," such that "the employer knew or reasonably should have known that the employee was disabled." Brady v. Wal-Mart Stores. Inc., 531 F.3d 127, 135 (2d Cir. 2008). In such instances, employers are expected to engage in "an interactive process [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." Id. (citation omitted) (alteration in original). Here, there is no doubt that Defendants were aware of Plaintiff's pregnancy, and therefore Defendants' motion to dismiss Plaintiff's failure to accommodate claim on a lack of notice ground is denied. See e.g., Peterson v. Pan Am Sys., Inc., No. 12-CV-1857, 2013 WL 4588846 at *4 n.11 (N.D.N.Y. Aug. 28, 2013) ("This obviousness might well be found given Plaintiff's allegations that he communicated with

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 37 of 40
Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)

2019 WL 2028701

Defendants regarding the severity of his injury and his work limitations.")

## C. Hostile Work Environment Claim

**\*5** Plaintiff contends that Defendants subjected her to a hostile work environment because of her pregnancy. For the reasons discussed below, the court grants Defendants' motion to dismiss Plaintiff's hostile work environment claim.

In order to establish a hostile work environment under Title VII, a plaintiff must allege "conduct (1) that is 'objectively' severe or pervasive—that is, it creates an environment that a reasonable person would find hostile or abusive (the 'objective requirement'), (2) that the plaintiff subjectively perceives as hostile or abusive (the 'subjective requirement'), and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) (the 'prohibited causal factor requirement')." Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001) (alterations in original) (internal quotations marks and citations omitted).

With respect to the objective requirement, the plaintiff must show that the defendant's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Id. "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (internal quotation marks and citation omitted). To determine whether an incident or series of incidents are severe or pervasive, "courts must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Id. (quoting Harris, 510 U.S. at 23). Allegations of isolated incidents of discriminatory comments or conduct generally do not suffice. See Williams v. N.Y.C. Dep't of Sanitation, No. 00-CV-7371 (AJP), 2001 WL 1154627, at \*13 (Sept. 28, 2001) (collecting cases). Still, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." Tomka v. Seiler Corp., 66

F.3d 1295, 1305 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

Here, Defendants contend that Plaintiff's allegations "amount to dissatisfaction with her supervisors, ... personality conflicts with Ms. Clapp, and general workplace grievances" and, therefore, that Plaintiff fails to allege a hostile work environment. (Mot. at 15.) Plaintiff alleges that upon learning of her pregnancy, her employer's "attitude completely changed" and she became the subject of "increased, unwarranted and uninvited insulting comments, mocking behavior, and unprecedented and unwarranted informal and formal meetings regarding Plaintiff's work performance." (Am. Compl. ¶ 39). Plaintiff further alleges that she would frequently "hear Ms. Clapp negatively discussing Plaintiff's pregnancy and her work performance to other co-workers." (Id. ¶ 45). As a result of Plaintiff's work environment, she allegedly expressed her work stress to her medical provider and her body would "shiver[ ] and jitter[ ] throughout the day." (Id. ¶ 50). Plaintiff also alleges that she suffered from "severe nose bleed[s]" and "no longer [had] an appetite." (Id. ¶¶ 53; 50).

**\*6** While this court finds that Plaintiff's allegations, taken as true, amount to far more than "general workplace grievances," (Mot. at 15) they do not rise to the high burden of alleging a hostile work environment. See Peralta v. Roros 940, Inc., 72 F. Supp. 3d 385, 395 (E.D.N.Y. 2014) ("In claiming a hostile work environment, plaintiff reasserts the facts underlying her discriminatory termination claim —in short, episodes of name-calling (heard secondhand), undue reprimands, perceived animosity, and unwelcome work assignments. This alleged pattern of behavior, while perhaps indicative of discriminatory animus, does not exhibit the severity or pervasiveness of an actionable hostile work environment."). Therefore, Defendants' motion to dismiss Plaintiff's hostile work environment claim is granted.

## D. Constructive Discharge Claim

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000) (internal quotation marks and citation omitted). "[A] constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of [her] work, or did not receive a raise, or preferred not to continue working for that employer. Nor is

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 38 of 40
Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)
2019 WL 2028701

the test merely whether the employee's working conditions were difficult or unpleasant." Spence v. Md. Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993) (citations omitted). Rather, a "plaintiff may prove a constructive discharge by establishing that [her] 'employer, rather than acting directly, deliberately made [her] working conditions so intolerable that [s]he was forced into an involuntary resignation,' i.e., 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Kirsch v. Fleet St., Ltd., 148 F.3d 149, (2d Cir. 1998) (quoting Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (alteration omitted)).

As the bar for constructive discharge claims is higher than that for hostile work environment, "pleadings that fail to pass muster under the less rigorous standard must also be found inadequate under the more demanding." Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014). Therefore, the court's dismissal of Plaintiff's hostile work environment claim necessitates the dismissal of Plaintiff's constructive discharge claim. See Swiderski v. Urban Outfitters, Inc., No. 14-CV-6307 (JPO), 2017 WL 6502221, at *13 (S.D.N.Y. Dec. 18, 2017) (noting that the standard for constructive discharge "is even more demanding than that required to prevail on a hostile environment claim"). See also Trinidad v. N.Y. Dep't of Corr., 423 F. Supp. 2d 151 (S.D.N.Y. 2006) ("[C]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case [under Title VII]"(citation omitted)); Ternullo v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) ("[T]his Court has held that to demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment.").

Accordingly, Plaintiff's constructive discharge claim is dismissed.

### E. Title VII and Pregnancy Discrimination Claims

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see also id. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). The PDA amended Title VII to provide that

discrimination "because of" an individual's sex includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions," and that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." Id. § 2000e(k).

**\*7** Pregnancy discrimination claims brought under Title VII are analyzed pursuant to the three-step, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Kerzer v. Kingly Mfg., 156 F.3d 396, 400-01 (2d Cir. 1998). "Under this framework, the plaintiff first must establish, by a preponderance of the evidence, a prima facie case of discrimination." Id. at 401. "A plaintiff can establish a prima facie case of pregnancy discrimination under Title VII by showing that: (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." Walsh v. N.Y.C. Hous. Auth, 828 F.3d 70, 75 (2d Cir. 2016) (analyzing gender discrimination claims brought pursuant to Title VII and the NYSHRL under McDonnell Douglas) (citation omitted).

Defendants argue that Plaintiff cannot establish the third element of her prima facie PDA and Title VII discrimination claims: failure to plead an adverse employment action. (Mot. at 12.) To prove that her "employer took adverse action", a plaintiff must show there was "a materially adverse change in the terms and conditions of employment." Galabuya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabuya, 202 F.3d at 640).

The court finds that Plaintiff has failed to plausibly allege an adverse employment action. Plaintiff alleges that upon informing Defendants of her pregnancy, her employer made unwelcome comments and changed her attitude toward Plaintiff, creating an environment so severely "hostil[e] and discriminat[ory]" that "Plaintiff was constructively terminated from her position." (Am. Compl. ¶ 62). Although a constructive discharge is "functionally the same as an actual termination" and is therefore considered an adverse employment action, for the reasons set forth above, Plaintiff

Case 5:25-cv-00630-LEK-TWD    Document 6    Filed 07/31/25    Page 39 of 40

Colas v. City of University of New York, Not Reported in Fed. Supp. (2019)

2019 WL 2028701

has failed to allege a constructive discharge claim. Pa. State Police v. Suders, 542 U.S. 129, 148 (2004); see also Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001) ("Adverse employment actions include discharge from employment. Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge."); Trachtenberg v. Dep't of Educ. of N.Y.C., 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) ("[A] 'constructive discharge' from employment does constitute an adverse employment action."). Therefore, Defendants motion to dismiss Plaintiff's Title VII and PDA discrimination claims is granted.

### F. Title VII Retaliation Claim

To establish a prima facie case of unlawful retaliation, a plaintiff must show "(1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013). (internal quotation marks and citation omitted). If the employer puts forward a non-retaliatory reason for the employment action, the plaintiff must then put forward evidence that the non-retaliatory reason is a mere pretext for retaliation. See id. at 845. Ultimately, a plaintiff asserting a Title VII retaliation claim must show that retaliation was a "but-for" cause for the adverse employment action. See Univ. of Tex. SW. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

**\*8** Defendants contend that Plaintiff's retaliation claim fails because she has not alleged that she engaged in any protected activity. (Mot. at 18.) Under Title VII, protected activity includes both "opposing discrimination proscribed by the statute and ... participating in Title VII proceedings." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct." Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 172 (2011). The conduct need not be prohibited by Title VII so long as plaintiff had a good faith belief that such conduct was prohibited. See La Grande v. DeCrescente Distrib. Co., 370 F. App'x 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.' " (quoting Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002))); Dall v. St. Catherine of

Siena Med. Ctr., 966 F. Supp. 2d 167, 192-93 (E.D.N.Y. 2013) (plaintiff need only have a "good faith belief" that employer conduct was prohibited); Kanhoye v. Altana Inc., 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) (" 'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.' " (quoting Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000))).

For a complaint to qualify as protected activity, an employee does not need to lodge a formal complaint of discrimination. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) ("While the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.' " (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990))); Bennett v. Hofstra Univ., 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (noting that Title VII does not require a formal complaint); Martin v. State Univ. of N.Y., 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.' " (citations omitted)).

However, while such complaints may be informal, they cannot be so vague or "generalized" that the employer could not "reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted); Brummell v. Webster Central School Dist., No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009) ("When making the complaint, Plaintiff must do so in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of [the protected status].")

Plaintiff alleges that in a meeting with Director Brown she told Brown that Ms. Clapp "smoke[d] an electric cigarette in the classroom; [had] inappropriate conversations around the children; [ate] in the classroom; [took] frequent breaks and exits the classroom; and [ ] frequently talk[ed] about her Tinder account during classroom time." (Compl. ¶ 57.) However, as Defendants point out, none of these complaints pertain or relate to unlawful discrimination. Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292

(2d Cir. 1998) (plaintiff's "generalized" complaints were not protected activity where employer "could not reasonably have understood that she was complaining of 'conduct prohibited by Title VII' " (citation omitted)). Moreover, Plaintiff herself explains that she did not speak to Human Resources because she feared it "would only make the situation even more worse and difficult." (Compl. ¶ 61.) Plaintiff's allegation that "shortly after complaining to Defendant of discriminatory treatment" Plaintiff was "subject to further discrimination and harassment, namely by way of a series of adverse actions that altered the terms and conditions of her employment leading to Plaintiff's constructive termination" (Am. Compl. ¶ 99) is conclusory and does not sufficiently plead that she engaged in any form of protected activity. See Iqbal, 556 U.S. at 678. Accordingly, Plaintiff's Title VII retaliation claim is hereby dismissed.

### G. NYSHRL & NYCHRL Compliance with New York Education Law § 6224

**\*9** The only argument Defendants raise with regard to Plaintiff's NYSHRL and NYCHRL claims is that they are barred for failure to file a timely notice of claim pursuant to New York Education Law § 6224(1). (Mot. at 20.) State notice of claim requirements apply to state claims brought in federal court. DeCarolis v. Town of Vienna, 322 F. App'x 25, 26 (2d Cir. 2009). However, for the reasons set forth below, the court finds that § 6224(1) does not apply to the matter at hand.

Section 6224(1) incorporates the notice of claim requirements of General Municipal Law §§ 50-e and 50-i. Section 50-e "provides the procedural mechanism for filing a notice of claim when required," and § 50-i "sets forth the kinds of actions which will trigger the requirement to provide a municipality with a notice of claim." Mills v. Monroe County, 453 N.Y.S.2d 486, 487 (N.Y. App. Div. 1982). Section 50–e states that "in any case founded upon tort" against a public corporation, or any of its officers, appointees, or employees, a plaintiff must serve a notice of claim on the public corporation within 90 days after the claim arises. Section 50-i provides that the tort actions that trigger the notice of claim requirement are actions for "personal injury, wrongful death or damage to real or personal property alleged to have been sustained

by reason of ... negligence or wrongful act." The New York Court of Appeals has held that "[h]uman rights claims are not tort actions under section 50-e and are not personal injury, wrongful death, or damage to personal property claims under section 50-i," so that "a notice of claim need not be filed for a Human Rights Law claim against a municipality." Margerum v. City of Buffalo, 28 N.E. 3d 515, 516, 518 (2015). The court further stated that it "[did] not perceive any reason to encumber the filing of discrimination claims." Id. at 519. See also Keles v. Yearwood, 254 F. Supp. 3d 466, 471 (E.D.N.Y. 2017) (analyzing the plain language of New York Education Law § 6224(1) and finding that it establishes that its notice of claim requirement applies to torts alone.) Accordingly, Defendants' motion to dismiss Plaintiff's NYSHRL and NYCHRL claims is denied.

### V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the following claims, which are dismissed:

- Plaintiff's Title VII and PDA discrimination claims;

- Plaintiff's constructive discharge claim;

- Plaintiff's Title VII hostile work environment claim; and

- Plaintiff's Title VII retaliation claim.

The motion is denied with respect to the following claims:

- Plaintiff's ADA and Section 504 of the Rehabilitation Act discrimination claims;

- Plaintiff's ADA failure to accommodate claim; and

- Plaintiff's NYSHRL and NYCHRL claims.
SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 2028701

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.